[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

Nos. 16-17175, 16-17595

_____

D.C. Docket No. 1:15-cr-20777-JEM-1

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

JUNIOR JEAN BAPTISTE,

Defendant - Appellant.

_____

Appeals from the United States District Court
for the Southern District of Florida

_____

(August 28, 2019)

Before WILLIAM PRYOR, NEWSOM, and BRANCH, Circuit Judges.

NEWSOM, Circuit Judge:

Jean Junior Baptiste was a businessman.  In addition to a portfolio of media

and entertainment companies, Baptiste owned and operated Surveillance Master

CCTV.  Surveillance Master installed security cameras, repaired computers, and—one of these things is not like the others—cashed checks.  In 2016, a jury found that Baptiste had taken part in an $11 million scheme that involved cashing tax-refund checks that he had fraudulently obtained in the names of inmates, minors, dead people, and other insentient or otherwise unsuspecting "clients."  Baptiste now appeals his conviction and 212-month sentence.

Although Baptiste raises a number of issues on appeal, we focus primarily on two questions related to the hearsay testimony of a government witness.  The abridged version of the story:  Francesse Chery was one of Baptiste's key witnesses.  The government countered with her brother, Anael Chery, who testified (among other things) that Francesse had told him that, in exchange for her (false) testimony supporting Baptiste's narrative, Baptiste would give her a Mercedes.  Baptiste argues that Anael's testimony was inadmissible hearsay and that the district court's error in allowing the jury to hear it tainted both his conviction and his sentence.

Baptiste's challenge presents two questions.  First, was Anael's testimony indeed inadmissible hearsay?  The district court admitted the testimony pursuant to the statement-against-interest exception to the general prohibition on hearsay evidence, and on appeal the government has offered a smattering of additional theories of admissibility.  We conclude that we needn't decide whether Anael's

2

testimony was inadmissible hearsay because even if the district court did err in allowing it, the error was harmless. There was more than enough compelling—and undoubtedly admissible—evidence to support Baptiste's conviction.

Second, and (sort of) relatedly, did the district court err in relying on Anael's testimony when it imposed a sentencing enhancement for obstructing justice? If you're saying, "Didn't they just say they weren't going to decide whether the testimony was admissible?"—we hear you. As it turns out, though, thanks to a doctrine called (somewhat oxymoronically) "reliable hearsay" we can answer the second question without deciding the first. Under the reliable-hearsay doctrine, so long as certain preconditions are met, a sentencing court can rely on evidence that would be off-limits in the guilt phase. For Baptiste, this means that even if Anael's description of his sister's supposed deal was inadmissible hearsay (and we aren't saying either way) the district court might not have erred in relying on that testimony for the obstruction enhancement—again, so long as the preconditions are met.

So, what are they? Well, our case law has arguably sent mixed signals about that. There is, though, a synthesis. We hold (and clarify) today that the Sentencing Guidelines permit use of hearsay testimony so long as the overall record provides "sufficient indicia of reliability"—and we conclude that the indicia of reliability here are sufficient.

Accordingly—and because we find that none of Baptiste's other arguments has merit—we affirm Baptiste's conviction and, with one asterisk, his sentence. The asterisk? Pursuant to the parties' joint request, we remand the case to the district court for the limited purpose of allowing Baptiste to allocute, a right that he was denied at sentencing.

**I**

During Baptiste's trial, two cooperating witnesses, Andy Louissaint and Karl Moltimer, described the tax-refund scheme. Baptiste would first provide tax preparers such as Louissaint and Moltimer with a list of individuals—many of them young, incarcerated, dead, or otherwise unlikely to discover the use of their identities—along with accompanying personal information such as birthdates and social security numbers. The tax preparers used that information to (fraudulently) obtain refund checks from the IRS, which they then brought to Baptiste's Surveillance Master for cashing.

Baptiste contracted with a third party to process the checks. He would fabricate the necessary documents—work permits, passports, green cards, driver's licenses—to avoid raising red flags. Baptiste and the tax preparers would divide the proceeds, with Baptiste often taking a cut of between 25% and 50%. Not bad, given that typical check-cashing fees range from 1.5% to 3%.

When the IRS reviewed Surveillance Master's records in conjunction with a routine inspection, an agent noticed that several refund checks were for identical (or nearly identical) amounts. During a subsequent investigation, the IRS obtained copies of identification documents, Treasury checks, and lists containing personal information for both the quick and the dead. Customs and Immigration Services conducted an evaluation of approximately 630 permanent-resident and employment-authorization cards that Baptiste had used to verify the checks; all but one—belonging to Baptiste's wife—were fraudulent.

The ensuing indictment charged Baptiste with money laundering, conspiracy to commit money laundering, possession of false identification documents with unlawful intent, theft of government money, and aggravated identity theft. At trial, Baptiste's story was that he was an unwitting participant in a broader scheme concocted by a now-dead business partner, Marvin Pagnon. Pagnon's ex-girlfriend, the aforementioned Francesse Chery, echoed Baptiste's account in her testimony and explained how Pagnon operated. In particular, she explained that because Pagnon had poor credit, he would ask would-be associates such as Baptiste to partner with him. Pagnon, she said, laid out a collaboration that was straightforward and above board: Pagnon would obtain (real) refund checks from tax preparers; Baptiste would cash whatever Pagnon handed him. Baptiste signed up, and he seems to have been well compensated for his efforts. During the

5

scheme, Baptiste purchased a Mercedes Benz CL 63, a Mercedes Benz E Class, a Range Rover, and—again, one of these things is not like the others—a $345,000 share in a 200-foot long cargo ship.

The government painted a different picture. Moltimer and Louissaint both testified, for instance, that Pagnon played no role in Baptiste's check-cashing operation. Louissaint added that when Baptiste first became aware that an indictment could be coming down the pike, he had told Louissaint that he planned to "basically blame everything on Marvin [Pagnon]." The government also offered testimony from Francesse Chery's brother, Anael. Anael first opined, as a general matter, that his sister just wasn't a very truthful person. He went on to testify, much more specifically, that Francesse had told him that Baptiste was going to give her a Mercedes CLA 45 so long as she "h[e]ld up her end of the bargain" by backing Baptiste's it-was-all-Pagnon's-idea narrative. Baptiste objected that Anael's testimony—relaying what his sister had allegedly told him—was inadmissible hearsay. The district court ultimately admitted Anael's statement, citing the statement-against-interest exception to the general prohibition on hearsay evidence. *See* Fed. R. Evid. 804(b)(3).

The jury convicted Baptiste on all counts. At sentencing, the district court applied enhancements for the amount of money that Baptiste had fraudulently obtained from the government (exceeding $11 million), for the number of victims

(perhaps hundreds), for the victims' vulnerable status (many incapacitated in some form or fashion), and for obstructing justice (for the perjury-for-a-Mercedes deal with Francesse). The district court sentenced Baptiste to 212 months' imprisonment and restitution of more than $11 million.[1] This is Baptiste's appeal.

## II

As already noted, our focus here will be the related contentions that the district court (1) abused its discretion by admitting Anael's hearsay testimony as evidence against Baptiste and (2) violated the Sentencing Guidelines by imposing an obstruction-based enhancement that relied on the same. Before getting there, though, we'll address a few other guilt-phase matters—namely, whether the district court erroneously refused to admit Rule 404(b) evidence, whether the government failed to reveal (alleged) deals with its witnesses, and whether the prosecutor made improper statements to the jury during his closing argument. Then, after dealing with the Anael-related issues, which span the trial and sentencing phases, we'll conclude with a few additional, sentencing-specific arguments—namely, that the district court erred in increasing Baptiste's sentence due to the amount of money that the government lost as well as the number and vulnerability of the scheme's victims, as well as in declining to permit Baptiste to allocute personally.

## A

---

[1] The court ordered that $70,000 of that total be paid jointly and severally with Moltimer.

7

**1**

During the trial, the district court refused to allow Baptiste to put on evidence that Marvin Pagnon had duped others into participating in similar schemes.  On appeal, Baptiste contends that, in so doing, the district court misapplied Federal Rule of Evidence 404(b), which states, in relevant part—

> **(1) Prohibited Uses.**  Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.
> **(2) Permitted Uses; Notice in a Criminal Case.**  This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.

Fed. R. Evid. 404(b).  In particular, Baptiste argues that his evidence would have demonstrated only Pagnon's *capacity* to implement his scheme—he had done so before, and so could do so again—rather than Pagnon's character or propensity more generally, and was therefore admissible as "reverse" 404(b) evidence—i.e., bad-acts evidence that "tends to negate the defendant's guilt of the crime charged against him."  *United States v. Seals*, 419 F.3d 600, 606 (7th Cir. 2005); *see also, e.g.*, *United States v. Cohen*, 888 F.2d 770, 776 (11th Cir. 1989) (admitting evidence showing that the government's witness "was capable of concocting and managing [a] fraudulent scheme").

The government doesn't really dispute Baptiste's premise—that the evidence bore on whether Pagnon was competent of pulling off such a scheme—

8

and, indeed, it quotes Baptiste's own brief back at him to make its point. In his brief, the government says, Baptiste admits that "[t]he purpose of the proffered evidence was to show that Pagnon was capable of implementing his fraudulent tax-refund scheme without the knowledge and involvement of the nominal owners." Br. of Appellant at 41. In so stating, the government contends, Baptiste has effectively conceded that the evidence was of the "pure propensity" variety, probative only of Pagnon's general mendacity.

The parties thus read the same bit of testimony in two very different ways. And not implausibly so. The evidence demonstrating that Pagnon had previously deceived others could be construed as indicating either Pagnon's capacity to do so again and/or his propensity to do so again—either "Pagnon is well-equipped to lie in these circumstances" or "Pagnon is a liar." The two interpretations are interrelated—mutually reinforcing, you might say—but only the former is generally admissible under Rule 404(b).

The trouble for Baptiste is that even scales won't get the job done. "Determinations of admissibility of evidence rest largely within the discretion of the trial judge and will not be disturbed on appeal absent a clear showing of an abuse of discretion." *United States v. Russell*, 703 F.2d 1243, 1249 (11th Cir. 1983). That this evidence can reasonably be read as (permissible) capacity

evidence or (impermissible) character evidence demonstrates that Baptiste hasn't made the required "clear showing."

**2**

Baptiste also objects to how the government prosecuted his case.  He makes two claims: first, that the government failed to disclose material issues involving key witnesses; and second, that the prosecutor's closing argument mischaracterized and exaggerated the evidence.

**a**

Baptiste alleges three disclosure violations.  First, he argues that the government failed to correct false testimony when one of its key witnesses, Moltimer, stated that he had derivative U.S. citizenship.  Baptiste contends that, in fact, Moltimer was *granted citizenship in exchange for testifying against Baptiste*. Second, Baptiste claims that Moltimer lied—and the government failed to correct—when he testified that he only met Pagnon in 2013.  Pagnon died in 2011, and according to Baptiste, the government's failure to set the record straight undermined Baptiste's defense that "Pagnon masterminded the scheme to dupe the unsuspecting Baptiste."  Br. of Appellant at 19.  Finally, Baptiste asserts that the government failed to disclose a cooperation agreement with Louissaint, preventing the jury from taking the true measure of Louissaint's incentives.

10

All three claims fall short.  Baptiste's first argument—about the government's alleged citizenship deal with Moltimer—rests on misleadingly selective quotations of the record.  Baptiste explains that Moltimer's attorney indicated that Moltimer had been "granted American citizenship," encouraging us to infer that this "grant[]" was in exchange for Moltimer's testimony against Baptiste.  But just before the snippet that Baptiste highlights, Moltimer's attorney stated that Moltimer "has been granted American citizenship *because of his being brought here when he was very young*" and that Moltimer's "mother was an American citizen."  (emphasis added).  And just after the passage excerpted by Baptiste, Moltimer's attorney continued, "ICE came to see him and went forward, and he has been granted American citizenship, *which he should have had from the start*."  (emphasis added).  Come on.  Baptiste's assertion that the government failed to disclose a citizenship-for-testimony deal with Moltimer is worse than conjectural—it appears to be flatly contradicted by the record.

As for Moltimer's testimony that he first met Pagnon three years after Pagnon's death, Baptiste is of course correct that—barring either time travel or necromancy—Moltimer was wrong.  But the focus for our purposes is not the shakiness of Moltimer's chronology but rather the government's failure to correct it.  *See Giglio v. United States*, 405 U.S. 150, 153 (1972).  To prove that the government's inaction violated his rights, Baptiste must show not only that the

11

government "[1] knowingly used perjured testimony, or failed to correct what [it] subsequently learned was false testimony, and [2] that the falsehood was material," but also that the testimony was "[3] given with the willful intent to provide false testimony and not as a result of a mistake, confusion, or faulty memory." *United States v. Horner*, 853 F.3d 1201, 1206 (11th Cir. 2017) (quoting another source), *cert. denied*, 138 S. Ct. 674 (2018).  Even setting aside that the jury was repeatedly reminded—including by Baptiste's attorney—that Pagnon was long dead by 2014, and that the falsehood was thus unlikely to have been material, Moltimer's testimony clearly indicates "mistake, confusion, or faulty memory." *See id.*  He said, for instance: "I've been in prison for almost two years.  I think met Marvin [Pagnon] in 2014.  I don't remember the exact date . . . ."  That testimony, we think, hardly suggests a "willful intent" to deceive on the government's part.

Finally, Baptiste alleges that the government failed to disclose a cooperation agreement with Louissaint.  Baptiste seizes on Louissaint's testimony that he was "still going to get charged."  Baptiste points out that, in fact, Louissaint was never charged, and he asks us to infer that the government cut a(nother) secret deal.  Again, we aren't persuaded—in part because the claim is highly speculative, and in part because, in order to prove materiality, Baptiste must show that the jury made credibility inferences from Louissaint's comment that don't necessarily follow.  For Louissaint's comment to be material, the jurors would have had to follow

12

something like the following chain of logic: (1) Louissaint testified that he was "still going to get charged"; (2) therefore [the jurors infer], Louissaint was not a cooperating witness, and in no way beholden to the government; (3) therefore [the jurors continue], Louissaint's testimony is more persuasive than it would have been if he weren't "going to get charged." The second statement doesn't necessarily follow from the first, nor the third from the second. Absent more compelling evidence that Louissaint actually cut a deal, we decline to indulge the sorts of leaps that Baptiste's argument requires.

**b**

The prosecutor told the jury during his closing argument that "everything out of [Francesse Chery's] mouth was a complete lie," that Baptiste "paid [a witness] to lie on the stand," and that "the only thing that smells like a fish . . . is the testimony of Francesse Chery." Baptiste argues that these statements mischaracterized the evidence presented at trial. He also takes issue with the prosecutor's summary of his defense as being "duped" by a "dead guy."

We'll start with the fish. "[A] prosecutor is justified in arguing during closing arguments that a particular witness is lying, if that is an inference supported by the evidence at trial." *United States v. Schmitz*, 634 F.3d 1247, 1270 (11th Cir. 2011). Anael Chery's testimony regarding his sister's truthfulness (or lack thereof) provided adequate support for the inference that Francesse lied on the

13

stand.  The government's description of the piscatorial odor emanating from Francesse's testimony was also permissible, if a little cheesy.  *Cf. Tucker v. Kemp*, 762 F.2d 1496, 1507 (11th Cir. 1985) (en banc) (references to defendant as "less than human," "not somebody in our society that we can afford to keep," and "a danger like a time bomb" permitted because "supported by the evidence.").[2]

What about the government's duped-by-a-dead-guy description of Baptiste's defense theory?  While Baptiste undoubtedly dislikes the government's turn of phrase, a passage from his own brief suffices to indicate its essential accuracy.  To recap, in closing, the government's lawyer said that Baptiste was trying to "make it look like some dead guy duped [him]."  Baptiste's brief on appeal summarizes his position as follows:  "Pagnon masterminded the scheme to dupe the unsuspecting Baptiste."  Br. of Appellant at 19.  Pretty similar.

In sum, although "[l]ittle time and no discussion is necessary to conclude that it is improper for a prosecutor to use misstatements and falsehoods," *Davis v. Zant*, 36 F.3d 1538, 1548 (11th Cir. 1994), we see neither here.

**B**

---

[2] We'll cut the government a bit of slack given the context.  The government's "fish" comment came in response to Baptiste's attorney's extended analogy at closing comparing Baptiste to a starfish tossed ashore by a hurricane.  Baptiste's attorney concluded, "My client, Junior Jean Baptiste, is the starfish," asking the jury "to fulfill your oath, look in your heart, do what the law requires, apply reasonable doubt and throw [Baptiste] back, throw him back to his family." Ooooooookay.

Now for the feature presentation.  Recall Anael Chery testified that his sister, Francesse, told him that Baptiste was going to give her a Mercedes CLA 45 in exchange for favorable testimony.  Responding to Baptiste's objection, the district court said that's "got to be hearsay."  Yep—textbook: "'Hearsay' means a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement."  Fed. R. Evid. 801(c).  Even so, the district court ultimately admitted Anael's testimony under the statement-against-interest exception to the rule against hearsay, *see* Fed. R. Evid. 804(b)(3), because Francesse's underlying statement "could subject [her] to perjury" or other "charges."

**1**

Perhaps anticipating some rough sledding, the government makes only a token effort to defend the district court's ruling—the statement-against-interest exception typically requires that the declarant be "unavailable," after all, and Francesse testified at trial.  *See* Fed. R. Evid. 804(b) ("The following are not excluded by the rule against hearsay if the declarant is unavailable as a witness . . . .").  The government goes on, though, to float three alternative rationales for why Anael's testimony was admissible: as the statement of a party opponent under Federal Rule of Evidence 801(d)(2)(D); as a statement by a co-conspirator under

15

Rule 801(d)(2)(E); and, finally, under Rule 807's residual exception.  For good measure, the government concludes its tour of the Federal Rules of Evidence by adding that even if the admission of Anael's testimony was erroneous, this error was harmless in light of the weight of the other (undoubtedly admissible) evidence against Baptiste.

We'll forgo the tour and head straight to the finish line.  We conclude that we needn't determine whether the district court erred in admitting Anael's testimony—as a statement against interest, or via any other exclusion or exception to the hearsay rule—because any error was indeed harmless.  "Even where an abuse of discretion is shown, nonconstitutional evidentiary errors are not grounds for reversal absent a reasonable likelihood that the defendant's substantial rights were affected."  *United States v. Sellers*, 906 F.2d 597, 601 (11th Cir. 1990); Fed. R. Evid. 103(a); *see also United States v. Guzman*, 167 F.3d 1350, 1353 (11th Cir. 1999) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946), for the proposition that "a nonconstitutional error requires reversal only if it resulted 'in actual prejudice because it had substantial and injurious effect or influence in determining the jury's verdict'") (cleaned up).

It's the government's burden to demonstrate that an alleged error was harmless, *United States v. Sweat*, 555 F.3d 1364, 1367 (11th Cir. 2009), and we conclude that it has met that burden here.  Strike Anael's testimony and the jury

16

would still have had before it—and we're only hitting the highlights here—Baptiste's curiously high income, gobs of documentary evidence showing fraudulent behavior, and the testimony of Moltimer and Louissaint, including that Baptiste planned to (and at trial did) "blame it on Marvin."  Under a long line of precedent, *see United States v. Hornaday*, 392 F.3d 1306, 1316 (11th Cir. 2004) (collecting applications of *Kotteakos*), such overwhelming evidence of guilt suffices to demonstrate that whatever error the district court might have committed didn't have a "substantial and injurious effect."  *Kotteakos*, 328 U.S. at 776.  Nor could the alleged error have influenced a reasonable juror's verdict.

**2**

Anael's testimony relating Francesse's statement about the Mercedes also underlay the district court's imposition of a sentencing enhancement for obstruction of justice.  Baptiste objects that because Francesse's statement was inadmissible hearsay, the district court improperly relied on it in finding obstruction.

Section 3C1.1 of the Sentencing Guidelines provides for a two-level enhancement if "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction."  U.S.S.G. § 3C1.1.

17

Examples of covered conduct include "committing, suborning, or attempting to suborn perjury." *Id*. at cmt. 4(B).

If Anael's testimony were admissible under one of the exceptions or exclusions to the rule against hearsay, there wouldn't be any question that the district court was on firm footing in relying on it for the enhancement. But if the testimony was inadmissible, then our earlier conclusion that its admission at trial was harmless wouldn't (in and of itself) validate the district court's reliance on it at sentencing. It all boils down to harm. Even if we strike Anael's testimony, there was still ample evidence supporting Baptiste's conviction. With regard to that component of the trial, Anael's testimony was harm*less*. But Anael's testimony provided the only evidence supporting Baptiste's enhancement for obstruction. With regard to that component of the trial, Anael's testimony was necessarily harm*ful*.

So have we reached the end of the road, such that we finally have to make a call on the admissibility of Anael's testimony? Not quite. Thanks to the "reliable hearsay" doctrine—which permits sentencing courts to rely on otherwise-inadmissible hearsay evidence in certain circumstances—we can reserve judgment on the evidence's admissibility (as we've done) while still addressing the district court's enhancement.

The doctrine is rooted in § 6A1.3 of the Sentencing Guidelines, which states that a court "may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy." U.S.S.G. § 6A1.3. Indeed, it's well established that "[i]n determining the relevant facts, sentencing judges are not restricted to information that would be admissible at trial." *Id.* at cmt. The reason, the Supreme Court has explained, is that "modern concepts individualizing punishment have made it all the more necessary that a sentencing judge not be denied an opportunity to obtain pertinent information by a requirement of rigid adherence to restrictive rules of evidence properly applicable to the trial." *Williams v. New York*, 337 U.S. 241, 247 (1949). *Williams*' "modern concepts" are old hat today, but no less important for it. Hence the need for a clear-headed understanding of when—and under what circumstances—hearsay evidence, in particular, can be deemed sufficiently reliable to support a sentencing decision.

The Sentencing Guidelines' text—just quoted—is crystal clear. It articulates a single precondition to a district court's consideration of otherwise inadmissible evidence, including hearsay, as part of its sentencing calculus: The evidence is fair game "provided that the information has sufficient indicia of reliability to support its probable accuracy." U.S.S.G. § 6A1.3. The trickier question is whether our

19

case law has engrafted another, extratextual criterion.  In particular, we've sent vaguely mixed signals about whether, as a prerequisite to relying on hearsay evidence at sentencing, a district court must make express findings on the record that the evidence is reliable—or if, instead, as the Guidelines' language indicates, it's enough that the record as a whole provides "sufficient indicia of reliability." The distinction matters here because it's undisputed that the district court did *not* make any explicit findings about the reliability of Francesse's testimony.

Some have read our decision in *United States v. Lee*, 68 F.3d 1267 (11th Cir. 1995), as requiring express findings that the hearsay evidence is reliable.  For reasons we have explained before—and will reiterate here—that is incorrect.  The defendant in *Lee* objected that the district court had relied on the hearsay evidence of one of his co-conspirators—Russell—in determining his sentence.  *See id.* at 1275.  We observed, as an initial matter, that "[a]ccording to the Sentencing Guidelines, and our case law interpreting them, the district court 'may consider any information, including reliable hearsay, regardless of the information's admissibility at trial, provided that there are *sufficient indicia of reliability* to support its probable accuracy.'"  *Id.* (quoting *United States v. Castellanos*, 904 F.2d 1490, 1495 (11th Cir. 1990), and citing U.S.S.G. § 6A1.3).  We stated that "the focus" of the inquiry "is upon the question of [the hearsay evidence's] reliability," and we further explained that reliability "must be determined on a case

20

by case basis." *Id*. The government there contended that Russell's hearsay statements were reliable because they were "against his penal interest," and we acknowledged that as a general matter "a statement made against one's penal interest may bolster its credibility." *Id*. at 1275–76. Even so, we concluded that "[i]n Russell's case," his penal interest "fail[ed] to qualify as a 'sufficient indic[ium] of reliability'" given his "status as a fugitive from justice." *Id*. at 1276. Accordingly, we concluded that "[s]pecific findings on Russell's credibility [were] necessary before the district court c[ould] use this evidence as a basis for determining" the defendant's sentence, and we remanded for the district court "to make further findings as to the reliability of Russell's hearsay statement." *Id*.

Our subsequent decision in *United States v. Gordon*, 231 F.3d 750 (11th Cir. 2000), clarified *Lee*'s holding and reach. The defendant there cited *Lee* in support of his contention "that the district court was required to make specific findings regarding the reliability" of hearsay testimony on which the government sought to rely at sentencing. *Id*. at 760. In response, we explained that *Lee* was never intended to—and didn't—prescribe a *per se* rule that findings are always necessary. *Id.* at 760–61. Rather, we made clear, *Lee*'s holding—that findings were required there—was a product of the "circumstances" that underlay that particular case. *Id*. Specifically, we said, it was because the traditional against-penal-interest justification didn't cut it, and because the hearsay declarant was a

21

fugitive, that the *Lee* court found "the absence of findings … particularly glaring and troubling." *Id.* By contrast, we emphasized in *Gordon*, where the record and the circumstances of the case "demonstrate adequate indicia of reliability," findings are not strictly necessary. *Id.* at 761. In such a case, a "district court's failure to make separate findings regarding the reliability of [hearsay] statements [is] not error." *Id.* Put differently, "the absence of such findings does not necessarily require reversal or remand where the reliability of the statements is apparent from the record." *Id.*[3]

So … is this a "*Lee*" case—in which the traditional indicia of reliability fall short and findings are thus required—or a "*Gordon*" case—in which the traditional indicia provide the necessary comfort? Clearly the latter, we think. For one,

---

[3] One loose end: After *Lee* but before *Gordon*, in *United States v. Anderton* we addressed a similar complaint that a district court had erroneously based its sentencing decision on "unreliable hearsay." 136 F.3d 747, 751 (11th Cir. 1998). In the course of rejecting that contention, we recited that "a court may rely on hearsay at sentencing, as long as the evidence has sufficient indicia of reliability, the court makes explicit findings of fact as to credibility, and the defendant has an opportunity to rebut the evidence." *Id.* Seemingly in support of the "explicit findings" aspect of that statement—albeit without saying so expressly—we cited our earlier decision in *Lee*. *Id. Anderton*, though, doesn't stand for the sort of *per se* rule that the *Gordon* defendant sought and that the *Gordon* panel rejected. The parties in *Anderton* never disputed whether "explicit findings" were required, and nothing rode on that issue. *Id.* Our decision simply assumed (at least in the circumstances presented) that they were, observed that the district court had made them, and held that they weren't clearly erroneous. *Id.* The same is true of our post-*Gordon* decisions in *United States v. Zlatogur*, 271 F.3d 1025, 1031 (11th Cir. 2001), and *United States v. Patti*, 337 F.3d 1317, 1326 (11th Cir. 2003), which merely recite *Anderton*'s boilerplate. And to the extent that one could read *Anderton* as contradicting *Lee*, and as holding that express findings of credibility are always required, we are bound by our prior-precedent rule to apply our earlier decision in *Lee*. *See United States v. Steele*, 147 F.3d 1316, 1318 (11th Cir. 1998) (en banc).

22

Francesse's statement—that Baptiste had promised her a Mercedes in exchange for favorable testimony—was clearly against both her and Baptiste's penal interests,[4] and there's no "fugitive from justice"-like reason here, as there was in *Lee*, to discount the force of that established gauge of reliability. For another, Francesse's statement aligned with Louissaint's testimony regarding how Baptiste planned to "blame everything" on Pagnon. And for yet another, her statement specifically identified the make and model of car she was set to receive. All of these are "indicia of reliability," and by our lights, collectively clear the "sufficien[cy]" threshold. *See Lee*, 68 F.3d at 1276.

Because this isn't the sort of case in which explicit findings were required, the district court didn't err in not making any. Nor did it err in relying on Francesse's sufficiently-reliable testimony to impose the obstruction-of-justice enhancement.

## C

That leaves a few sentencing-related loose ends.

## 1

As an initial matter, Baptiste challenges the district court's imposition of sentencing enhancements for the amount of money that the government lost and

---

[4] Even if, as we have said, it might (?) not formally qualify for the statement-against-interest exception to the hearsay rule because Francesse testified at trial and thus might (?) not have been "unavailable," as Rule 804(b)(3) requires. *See supra* at 16–17.

23

the number and vulnerability of the scheme's victims. U.S.S.G. § 2B1.1(b)(1)(K) (amount lost exceeding $9,500,000); § 2B1.1(b)(2)(A) (offense involving more than 10 victims); § 3A1.1(b)(1)–(2) (vulnerable victims).

**a**

As for the amount of money involved, we note first that Baptiste expressly withdrew all objections except those relating to the enhancements for obstruction of justice and the number and vulnerability of his victims. We needn't determine whether in doing so Baptiste invited any alleged error, because even under the typical clear-error standard, *see United States v. Castaneda-Pozo*, 877 F.3d 1249, 1251 (11th Cir. 2017), Baptiste's argument fails. The government submitted evidence indicating that Surveillance Master and its associated bank accounts were all under Baptiste's name. The identification documents reviewed by Customs and Immigration Services also demonstrated that it was reasonable for the district court to conclude that virtually all of Surveillance Master's check-cashing business was fraudulent—629 of the 630 IDs reviewed were fakes. Finally, "[t]he district court is only required to make a reasonable estimate of the loss." *United States v. Cobb*, 842 F.3d 1213, 1218 (11th Cir. 2016); U.S.S.G. § 2B1.1, cmt. 3(C); *see also United States v. Medina*, 485 F.3d 1291, 1304 (11th Cir. 2007) (indicating that a reasonable estimate is particularly appropriate in fraud cases because the amount lost is often difficult to determine with precision). We thus have evidence

24

indicating that the sums lost went to Baptiste, that virtually all of the money that passed through the check-cashing business was linked to the scheme, as well as precedent underscoring that the district court could apply this enhancement even if it couldn't determine a precise figure.  Taken together, we don't see error here, much less of the "clear" variety.

**b**

Baptiste's challenges to the enhancements based on the vulnerability and number of the scheme's victims travel together.  The Sentencing Guidelines provide for a two-level increase on the ground that he "knew or should have known that a victim of the offense was a vulnerable victim."  U.S.S.G. § 3A1.1(b)(1).  We have held that "both circumstances and immutable characteristics can render a victim vulnerable," *United States v. Bradley*, 644 F.3d 1213, 1288 (11th Cir. 2011), and that "[n]either bodily injury nor financial loss is required" for the enhancement, *United States v. Moran*, 778 F.3d 942, 978 (11th Cir. 2015).  Our decision in *United States v. Pierre*, 825 F.3d 1183 (11th Cir. 2016), settles the matter with regard to Baptiste's use of prisoners' identities.  We explained there that "inmates have unique circumstances and immutable characteristics that make them . . . vulnerable to . . . fraudulent activity."  *Id.* at 1196; *see also id.* ("Inmates usually do not file tax returns during periods of incarceration, and they are less likely to discover that their identities have been compromised.").  The government

25

presented evidence showing that Baptiste specifically requested the identities of prisoners, so the vulnerability-of-victims enhancement checks out.[5]  So too the number-of-victims enhancement; the district could reasonably infer from the evidence detailing the number of checks that Baptiste cashed that he had targeted a "large number" of people.  *See* U.S.S.G. § 3A1.1(b)(2) (stipulating that if (i) § 3A1.1(b)(1) applies and (ii) "the offense involved a large number of vulnerable victims," the defendant's offense level should be raised an additional two levels.).

**2**

Finally—and simply for us—the parties agree that the district court plainly erred in failing to "address the defendant personally in order to permit the defendant to speak" at sentencing, as Federal Rule of Criminal Procedure 32(i)(4)(A)(ii) expressly requires.[6]  In response to the district court's query, "Does the defendant wish to address me?", Baptiste's attorney responded on his client's behalf: "Mr. Baptiste respectfully has nothing to add."  However formalistic it may seem, and even reviewing for plain error, we agree with the parties that this

---

[5] Because the record supports the district court's finding that Baptiste targeted incarcerated victims, we can affirm the enhancement for vulnerable victims on that ground alone.  We needn't determine whether the deceased count as "vulnerable" as that term is used in § 3A1.1(b).  *Compare United States v. Roberson*, 872 F.2d 597, 609 (5th Cir. 1989) (sentence of a defendant convicted of fraud properly enhanced where the defendant used a dead companion's credit card after burning his corpse), *with United States v. Shumway*, 112 F.3d 1413, 1424 (10th Cir. 1997) (refusing to find that skeletal remains are a "vulnerable victim").

[6] "Before imposing sentence, the court must . . . (ii) address the defendant personally in order to permit the defendant to speak or present any information to mitigate the sentence . . . ."  Fed. R. Crim. P. 32(i)(4)(A)(ii).

26

exchange—between court and counsel rather than court and defendant—amounted to "(1) error, (2) that is plain and (3) that affect[ed] [Baptiste's] substantial rights," and that the error "[4] seriously affect[ed] the fairness, integrity, or public reputation of judicial proceedings." *United States v. Turner*, 474 F.3d 1265, 1276 (11th Cir. 2007); *United States v. Doyle*, 857 F.3d 1115, 1120 (11th Cir. 2017) ("[T]he presumption of prejudice in denial of allocution cases is still the rule when a defendant is not sentenced at the bottom of his guidelines range . . . ."); *United States v. Prouty*, 303 F.3d 1249, 1251 n.1 (11th Cir. 2002) (rejecting "the Government's argument that directing comments to the lawyers suffices to comply with the rule"). On remand, Baptiste should be afforded the opportunity to address the court directly.

## III

Accordingly, we hold as follows:

(A) The district court did not abuse its discretion in refusing to allow Baptiste to introduce evidence that Marvin Pagnon had duped others into participating in similar schemes. Nor did the government fail to disclose any material information concerning its witnesses or mischaracterize or exaggerate the evidence during its closing argument.

(B) Any error that the district court might have committed in admitting Anael Chery's testimony relaying his sister Francesse's statement that Baptiste had

promised her a car in exchange for favorable testimony was harmless.  And the district court did not err in relying on the same evidence to support an obstruction-related sentencing enhancement because the record reveals that the evidence bore "sufficient indicia of reliability."

(C) The district court did not err in imposing sentencing enhancements pertaining to the amount of money that the government lost and the number and vulnerability of Baptiste's scheme's victims.  The district court did reversibly err, however, when it failed to permit Baptiste to allocute personally.

**AFFIRMED IN PART AND REMANDED**.