[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

————————————————

No. 19-13720
Non-Argument Calendar

————————————————

D.C. Docket No. 6:16-cr-00027-CEM-KRS-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ABDULLAH HAMIDULLAH,
a.k.a. Abdullah Hamid,
a.k.a. Abdullah Al Hamid,
a.k.a. Supafly,

Defendant-Appellant.

————————————————

Appeal from the United States District Court
for the Middle District of Florida

————————————————

(March 1, 2021)

Before ROSENBAUM, NEWSOM, and ANDERSON, Circuit Judges.

PER CURIAM:

Abdullah Hamidullah pled guilty to four sex trafficking offenses and was sentenced to a total term of 482 months of imprisonment, more than double his advisory guideline range. He appealed, and we vacated the sentence on the narrow ground that the district court procedurally erred by relying on disputed and unproven factual statements in the presentence investigation report ("PSR"). *United States v. Hamidullah*, 768 F. App'x 914, 918–19 (11th Cir. 2019). We remanded for resentencing and expressly permitted the government to present evidence in support of the disputed facts. *Id.* at 919.

When the case returned on remand, Hamidullah moved to withdraw his guilty plea, claiming that one of the disputed facts affected the validity of his plea, and re-raised his objections to the PSR. The district court denied the motion to withdraw and then, after hearing testimony from two government agents who had interviewed Hamidullah's victims, overruled his objections to the PSR. The court resentenced Hamidullah to the same term of 482 months of imprisonment.

On appeal, Hamidullah argues that the district court abused its discretion by denying his motion to withdraw his guilty plea. He also challenges his sentence, contending that the court procedurally erred by basing the sentence on unreliable hearsay testimony and abused its discretion by imposing a substantively unreasonable sentence which was more than double the sentence recommended by the Sentencing Guidelines and by the government. After careful review, we affirm.

2

## I.

In February 2016, Hamidullah and a codefendant, Christina Davis, were indicted on several offenses related to sex trafficking. Hamidullah negotiated a plea agreement with the government in which he agreed to plead guilty to one count of sex trafficking through the use of force, threats of force, fraud, and coercion, in violation of 18 U.S.C. § 1591(a) (Count Two), one count of transportation of an individual in interstate commerce with the intent that such individual engage in prostitution, in violation of 18 U.S.C. § 2421 (Count Three), and two counts of enticement of an individual to travel in interstate commerce with the intent that such individual engage in prostitution, in violation of 18 U.S.C. § 2422(a) (Counts Four and Five). Davis pled guilty to one count of using interstate commerce to aid an unlawful prostitution enterprise, in violation of 18 U.S.C. § 1952(a)(3) (Count Six).

Hamidullah's plea agreement included a stipulated factual basis for his guilty plea. According to the factual basis, Hamidullah operated a prostitution enterprise involving at least three women, known by their initials as L.P., A.W., and T.R. Between December 2010 and February 2011, "the defendant transported, persuaded, induced, and enticed A.W., L.P., and T.R. to travel in interstate commerce with the intent that A.W., L.P., and T.R. engage in prostitution." In particular, Hamidullah advertised these women for commercial sex on Internet webpages and print media,

3

and in January 2011 they traveled at his direction from Orlando, Florida, to engage in prostitution in Washington, D.C.

During this same period, the factual basis continued, Hamidullah "used a combination of force, fraud, and coercion to intimidate A.W. in order to cause her to fear that she would suffer serious harm if she did not continue prostituting for the defendant's profit." This conduct included "assaulting A.W., retaining all of the prostitution proceeds, . . . taking her cell phone that contained A.W.'s stored contacts, confiscating all of A.W.'s money, showing A.W. his handgun, having A.W. tattooed with the word 'Daddy,' and installing an alarm on the apartment door without providing A.W. the access code." The factual basis explained that A.W. became involved with Hamidullah after she answered an Internet advertisement that he and L.P.—who had worked for Hamidullah since 2005 and was in a sexual relationship with him—posted "to recruit women into the defendant's prostitution enterprise by falsely offering employment." Acting on Hamidullah's behalf, L.P. "falsely represented that A.W. could make a lot of money, but did not disclose that A.W. was being recruited to prostitute for the defendant's profit."

At a change-of-plea hearing in June 2017, the district court conducted the plea colloquy required by Rule 11, Fed. R. Crim. P., covering the elements of the four counts, the minimum and maximum penalties, the Sentencing Guidelines, the terms of the plea agreement, and the rights Hamidullah was waiving by pleading guilty,

among other things. Hamidullah stated that he understood, and he confirmed that he had reviewed and signed the plea agreement, that he was entering the guilty plea freely and voluntarily, and that he had fully discussed the case with his attorney and was satisfied with her representation.

Near the end of the hearing, the district court asked the government to give a brief proffer of what it intended to prove if the case went to trial. As the government began to summarize the plea agreement's factual basis, the court interjected to ask about the content of the Internet advertisement referenced in the factual basis. The government responded that it was "for modeling," and continued with the summary. When the government finished, Hamidullah spoke with his attorney and then objected that he had advertised for "escorts," not "models." The government responded that the "evidence in this case and the witnesses that we have available would testify that the ad was for modeling." The district court, stating that they were "way in the weeds," noted the dispute for the record and indicated that it would be resolved at sentencing, when the "ad will likely be presented to the [c]ourt as an exhibit." Hamidullah had no other objections, so the court accepted his guilty plea as knowingly and voluntarily made and concluded the hearing.

Before sentencing, the probation office prepared Hamidullah's PSR. The PSR described Hamidullah's offense conduct in considerably greater detail than the factual basis in the plea agreement. As we recounted in Hamidullah's previous

appeal, the PSR described the offense and relevant conduct, in relevant part, as follows:

> The PS[R] stated that several of Hamidullah's victims responded to newspaper or online advertisements seeking escorts and models. Hamidullah then informed the women that they would be prostituting themselves.
>
> Hamidullah kept the prostitution proceeds. Hamidullah physically, sexually, and emotionally abused the women. The sexual abuse included whipping with chains and dog leashes, choking, and anal sex. Hamidullah also provided the women with alcohol, marijuana, and Xanax and forced women to have abortions.
>
> Hamidullah instructed his victims to "find women with family problems" on social media and told them what to say to the women online and over the phone and how to convince them to prostitute themselves once they arrived in person.

*Hamidullah*, 768 F. App'x at 916. There were also victim-impact statements from A.W. and another victim, J.R., who described the severe, lasting damage Hamidullah's conduct had caused them.

Hamidullah raised numerous objections to the factual assertions in the PSR that went beyond what was included in the plea agreement. In relevant part, Hamidullah denied (1) advertising for models; (2) forcing women to have abortions; (3) sexually assaulting any victims; (4) giving drugs to victims; and (5) instructing others to recruit women with family problems. The district court overruled these objections at sentencing and adopted the PSR's factual statements without hearing

6

evidence from the government. The court then referenced the disputed facts in imposing a total sentence of 482 months of imprisonment.

Hamidullah appealed, and we vacated and remanded. We found that the district court erred by relying on disputed facts that the government had failed to prove by a preponderance of the evidence. *Id.* at 918–19. Nevertheless, we concluded that, in the circumstances of the case, "the [g]overnment should be permitted to present additional evidence on remand." *Id.* at 919 (noting that the district court largely "did not expressly rule on any of Hamidullah's objections or the Government's responses before relying on the Government's responses as support for the sentence").

## II.

When the case returned to the district court on remand, Hamidullah filed a sentencing memorandum adopting his prior objections to the PSR. After a brief continuance of the resentencing hearing, he then filed a motion to withdraw his guilty plea, alleging that the disputed fact of whether he recruited victims by placing advertisements for "escorts," as opposed to "models," was fundamental to the validity of his guilty plea. In his view, the district court had indicated at the change-of-plea hearing that it would "allow him the opportunity to withdraw his plea" if the government failed to offer proof of this fact at sentencing. Because the government did not offer such proof and had no such evidence, Hamidullah asserted, he was

7

entitled to withdraw his guilty plea.  Responding in opposition, the government argued that this factual dispute was not relevant to or included in the factual basis for his guilty plea, which Hamidullah knowingly and voluntarily agreed was sufficient on its own to meet every element of the offenses charged.

At Hamidullah's resentencing, the district court first addressed the motion to withdraw and, after hearing argument from the parties, denied it. The court noted that, while Hamidullah denied "he was misleading these victims by advertising that it was a modeling service versus an escort service," he also "agreed multiple times in the plea agreement that he was deliberately and fraudulently misleading these victims."  Given the "context of the overall change of plea," the court found Hamidullah's assertions regarding the importance of the factual dispute not credible.

Turning to Hamidullah's objections to the PSR, the district court heard testimony from two government witnesses, Special Agent Brady Oberholtzer and Agent Quincy Alleyne.  Oberholtzer testified about A.W.'s statements during three interviews he conducted with her. In November 2010, according to Oberholtzer, A.W., who had just turned eighteen years old and recently lost custody of her baby, responded to a Craigslist advertisement for "adult modeling" and spoke with L.P., who offered A.W. a lucrative job modeling lingerie for wealthy clients in Orlando. A.W. accepted.  The day after she arrived in Orlando, however, she learned that she was expected to have sex for money.  A.W. reluctantly agreed to go forward with a

"date" that day, and she had sex with approximately eight men per day for the next several days. She was able to keep half the proceeds during this time.

Oberholtzer further testified that L.P. left town after about a week, leaving A.W. alone with Hamidullah. He began to drink and offered her Xanax, which she refused. He then tried to kiss her, but she refused again. In response, he struck her and called her a "bitch." He then retrieved a metal dog leash, whipped her with it, put it around her neck, and took her to the back bedroom and raped her. He told her, "your pussy will never be anyone else's but mine." The next day, he took her phone and gave her a new one with none of her contacts. A.W. continued to see multiple clients per day, but Hamidullah kept all the proceeds. And he continued to assault A.W., smashing her head into a wall on one occasion and using the metal dog leash to whip her on the buttocks, back, and thighs on other occasions. In addition, he gave her five to six Xanaxes per day, made her get a tattoo of the word "daddy," and installed an alarm system at the apartment without providing her the access code. A.W. also stated that Hamidullah forced another victim, T.R., to get an abortion when he found out she was pregnant. A.W. and T.R. fled the apartment one day when Hamidullah went to pick up L.P. from the airport.

Agent Alleyne testified about his interview with L.P. According to Alleyne, L.P. stated that Hamidullah told her to recruit "young beautiful women" with "family issues" "so that he could create a sense of family" to exploit through

"manipulat[ion]" and "mind games." L.P. placed advertisements for Hamidullah stating that the job was for either escorting or modeling. L.P. first met him in 2005, when she was eighteen years old and in high school, after responding to a similar advertisement. L.P. began prostituting for Hamidullah, who kept the proceeds. In 2010, L.P. decided to leave him because of verbal, physical, and sexual abuse. This abuse, according to L.P., included breaking her nose and insisting that she have sex when she did not want to. When L.P. told him she wanted to leave, he said she needed to find a replacement to be his "main girl," and A.W. was intended to be that replacement. L.P. also confirmed that T.R. had an abortion.

Alleyne further testified about his interview with T.R., who was recruited shortly after A.W. According to Alleyne, T.R. stated that she was eighteen years old when she was recruited by L.P. to be an escort and go on dinner dates with wealthy men. She soon learned that escorting meant prostitution, and T.R. began seeing clients for Hamidullah, who kept the proceeds. At some point T.R. started gaining weight because she became pregnant. When Hamidullah found out, he became very angry and forced her to get an abortion against her will. Alleyne testified that he was able to corroborate that Hamidullah drove T.R. to the abortion clinic where the procedure was performed, because the clinic kept records of its patients' drivers. T.R. also provided details about her interactions with A.W. Hamidullah largely kept T.R. and A.W. separate, though T.R. saw bruises on A.W.'s body and once saw him

10

throw a chair at A.W.  As a result, T.R. became "terrified" of him.  A.W. also told her that she was being physically and sexually abused by Hamidullah and that he would choke her and force her to have anal sex with him.

Alleyne further testified about his post-arrest interview with Christina Davis, Hamidullah's codefendant. Davis stated that she engaged in prostitution for Hamidullah and suffered verbal, physical, sexual abuse at his hands.  Against Davis's wishes, Hamidullah would have "rough sex" with her and slap her.  Once he whipped her with a cord.  He also took her driver's license and did not give her the code to the apartment's alarm system.

Finally, Alleyne testified that multiple other women were interviewed as part of the criminal investigation.  The government played clips of an interview with one such woman, J.R., at sentencing.  In these clips, according to Alleyne, J.R. described how Hamidullah forced her to have sex with him, physically abused her, and "forced all the women to have abortions."  Later, the court referenced the clips and indicated that J.R. had stated that Hamidullah "forced her handcuffed nude in the bathtub and forcibly poured alcohol down her throat."

Throughout this testimony, Hamidullah's counsel lodged objections based on hearsay and the reliability of the information.  The district court overruled the hearsay objections, stating that hearsay was admissible in a sentencing hearing and

indicating that it viewed the hearsay testimony as reliable and partially corroborated by the facts Hamidullah admitted in the plea agreement.

The district court overruled Hamidullah's various objections to the factual statements in the PSR. The court calculated a guideline range of 180 to 210 months based on a total offense level of 35 and a criminal-history category of I. After a one-level reduction for substantial assistance under U.S.S.G. § 5K1.1, the guideline range became 151 to 188 months, though a mandatory sentence of fifteen years applied to the § 1591 offense. *See* 18 U.S.C. § 1591(b)(1).

Hamidullah requested a sentence near the statutory minimum, arguing that such a sentence was still "very severe," in line with the guideline range and the government's recommendation, and was appropriate to meet the goals of deterrence, protection of the public, and rehabilitation. Consistent with its promises in the plea agreement, the government requested a sentence of 188 months, at the high end of the guideline range.

In pronouncing sentence, the district court reviewed the plea agreement's factual basis and noted that it partially corroborated much of the hearsay testimony the court heard at sentencing. As for the dispute about the content of the advertisements, the court stated that it was "inconsequential." The court explained,

> He defrauded the victims, isolated the victims, assaulted the victims, kept all of their money, imprisoned them, and then mutilated them by forcing them to get tattoos that said "daddy" on them. So whether or not the advertisement was for modeling or escorts or adult modeling, I

12

think it's like changing the tire on a car that's on fire.  The real issue here is that whatever the advertisement was for, these young people did not come over here believing that they were going to be . . . defrauded, isolated, assaulted, have all of their money confiscated, be imprisoned, be forced to get these tattoos.  So I'm not really that concerned with what they were told to get them there.

The district court went on to describe Hamidullah's conduct as "the most depraved behavior I've ever seen" outside of murder cases in five years on the federal bench, resulting in a "trail of lives that he's just ruined." The court rejected Hamidullah's argument that supervised release would be an adequate deterrent to reoffending, noting that "[p]eople violate supervised release."

Ultimately, the district court sentenced Hamidullah to a total term of 482 months of imprisonment, stating that it was sufficient but not greater than necessary based on the 18 U.S.C. § 3553(a) sentencing factors.  That term consisted of 180 months as to Count 2, 120 months as to Count 3, 151 months as to Count 4, and 151 months as to Count 5, with the concurrent sentences for Counts 2 and 3 running consecutively to the concurrent sentences for Counts 4 and 5.  Hamidullah objected to the court's reliance on hearsay, the substantive reasonableness of the sentence, and the denial of his motion to withdraw his guilty plea.  He now appeals, pressing these same arguments.

## II.

We begin with the denial of Hamidullah's motion to withdraw his guilty plea, which we review for an abuse of discretion.[1] *United States v. Brehm*, 442 F.3d 1291, 1298 (11th Cir. 2006). "There is no abuse of discretion unless the denial is arbitrary or unreasonable." *Id.* (quotation marks omitted).

A defendant may withdraw a guilty plea before sentencing if he "can show a fair and just reason for requesting the withdrawal." Fed. R. Crim. P. 11(d)(2)(B). To determine whether a defendant has shown such a "fair and just reason," the district court should "consider the totality of the circumstances surrounding the plea," including these four factors: "(1) whether close assistance of counsel was available; (2) whether the plea was knowing and voluntary; (3) whether judicial resources would be conserved; and (4) whether the government would be prejudiced if the defendant were allowed to withdraw his plea." *United States v. Buckles*, 843 F.2d 469, 471–72 (11th Cir. 1988) (citation omitted). The good faith, credibility, and weight of a defendant's assertions in support of a motion to withdraw his plea are issues for the trial court to decide. *Id.* at 472. If a defendant cannot satisfy the first two factors, the district court need not give "particular attention" to the

---

[1] We need not and do not address the government's contention that the doctrine of law of the case bars Hamidullah from challenging the validity of his guilty plea on the ground that he did not challenge the validity of his plea in his first appeal. Law of the case is a "judicially created doctrine," not jurisdictional, *Heathcoat v. Potts*, 905 F.2d 367, 370 (11th Cir. 1990), and Hamidullah is not entitled to relief on the merits even if the doctrine does not apply. Because Hamidullah's motion to supplement the record appears to relate solely to the government's law-of-the-case argument, the motion is **DENIED AS MOOT**.

remaining factors. *See United States v. Gonzalez-Mercado*, 808 F.2d 796, 801 (11th Cir. 1987).

Here, the district court properly denied Hamidullah's motion to withdraw his guilty plea. First, Hamidullah does not dispute that he had close assistance of counsel during both plea negotiations and the change-of-plea hearing. In fact, Hamidullah affirmed during the plea colloquy that he had fully discussed the case with his attorney and was satisfied with her representation. He has failed to rebut the "strong presumption" that these sworn statements are true. *See United States v. Medlock*, 12 F.3d 185, 187 (11th Cir. 1994) ("There is a strong presumption that the statements made during the colloquy are true.").

Second, Hamidullah has made no showing that the factual dispute regarding the content of the advertisement affected whether the plea was knowing and voluntary. At the plea hearing, the district court fully complied with Rule 11, and Hamidullah affirmed that his guilty plea was voluntary, that he committed the alleged offenses as set out in the plea agreement's factual basis, and that he understood the consequences of his guilty plea, including a waiver of his trial rights. Again, Hamidullah has failed to rebut the "strong presumption" that these statements are true. *See id.*

Hamidullah claims that the district court's comments at the plea hearing caused him to believe "that if the government did not present the actual

advertisements at the sentencing hearing, the [d]istrict [c]ourt would revisit his plea and allow him the opportunity to withdraw his plea." But the district court reasonably concluded that this claim was not credible. *See Buckles*, 843 F.2d at 472.

As the district court explained, whether the advertisements said "modeling" or "escorting" was insignificant in the overall context of his guilty plea admissions. Regardless of the specific wording, Hamidullah admitted that the advertisements were designed "to recruit women into the defendant's prostitution enterprise by falsely offering employment" and that he "did not disclose that A.W. was being recruited to prostitute for the defendant's profit."

Moreover, Hamidullah knew there was a dispute between the parties on this point when he finalized the plea agreement, having argued successfully to remove the "modeling" language, and he chose to go forward with his guilty plea. That suggests he recognized that this factual dispute was not relevant to whether he committed the elements of the charged offenses and would have no role at the plea hearing. The fact that the district court's curiosity revealed the parties' dispute at the plea hearing does not transform the significance of the dispute, which the court rightly recognized was simply a factual matter to be resolved at sentencing, not something going to the validity of Hamidullah's plea.

The timing of Hamidullah's motion to withdraw also deserves consideration. *See Gonzalez-Mercado*, 808 F.2d at 801 (noting that "the time between entry of the

plea and motion to withdraw the plea may be indicative of defendant's motivation"). Hamidullah's motion to withdraw came after the judge imposed a much harsher sentence than recommended by the Sentencing Guidelines or the government, which suggests that he sought to withdraw his plea after we vacated the sentence in anticipation of receiving a similarly harsh sentence at resentencing. *See id.*

Because Hamidullah had close assistance of counsel and he has made no showing that his guilty plea was unknowing or involuntary, we need not give "particular attention" to the factors of judicial efficiency and prejudice to the government. *See id.* For the reasons we have explained, the district court reasonably concluded that Hamidullah did not present a fair and just reason for withdrawing his guilty plea. *See* Fed. R. Crim. P. 11(d)(2)(B).

## III.

Turning to the 482-month sentence, Hamidullah raises procedural and substantive issues. Procedurally, he maintains that the district court improperly resolved disputed facts based on hearsay, double hearsay, and even triple hearsay. Substantively, he contends that his sentence is unreasonably harsh, more than double the sentence recommended by the government and the Sentencing Guidelines.

## A.

We review the factual findings of the sentencing court for clear error. *United States v. Rodriguez*, 732 F.3d 1299, 1305 (11th Cir. 2013). "Although review for

17

clear error is deferential, a finding of fact must be supported by substantial evidence." *Id.* (quotation marks omitted).

The government bears the burden of proving disputed facts at sentencing by a preponderance of the evidence. *Id.* To meet this burden, the government's evidence must be "reliable and specific." *Id.* Hearsay evidence can support a sentencing decision, "provided that the information has sufficient indicia of reliability to support its probable accuracy." *United States v. Johnson*, 980 F.3d 1364, 1373 (11th Cir. 2020) (quoting U.S.S.G. § 6A1.3). Explicit reliability findings may be required where the reliability of the hearsay statements is not apparent from the record. *United States v. Gordon*, 231 F.3d 750, 760–61 (11th Cir. 2000).

Hamidullah broadly condemns the district court's reliance at the resentencing hearing on "unreliable totem pole double and triple hearsay presented through agent summary testimony" of "dated unsworn interviews of putative co-conspirators facing possible prosecution themselves." In relying on this testimony, in Hamidullah's view, the court committed the same procedural error—basing the sentence on evidence without adequate support in the record—that led us to vacate his original sentence. We disagree.

As we have noted, Hamidullah broadly disputed these five factual matters described in the PSR: (1) whether he advertised for models; (2) whether he forced women to have abortions; (3) whether he sexually assaulted any victims; (4) whether

he gave drugs to victims; and (5) whether he instructed others to recruit women with family problems.

In support of the PSR at resentencing, the government called two witnesses, Special Agent Oberholtzer and Agent Alleyne, to testify about hearsay statements made by victims A.W., L.P., and T.R. during interviews with law enforcement. It also offered clips of a recorded interview with another victim, J.R. The evidence relating to each of the five factual disputes included the following: (1) A.W. stated that she responded to an ad for modeling; and L.P. said she placed advertisements for Hamidullah seeking escorts or models; (2) T.R. stated that Hamidullah forced her to get an abortion against her will; both L.P. and A.W. gave similar information; and Alleyne obtained records indicating that Hamidullah drove T.R. to the abortion clinic; (3) A.W. described a specific instance of sexual assault involving Hamidullah striking her with a metal dog leash, raping her, and telling her "your pussy will never be anyone else's but mine"; L.P. stated that Hamidullah made her have sex when she did not want to; and Davis (Hamidullah's codefendant) reported unwillingly engaging in "rough sex" with Hamidullah; (4) A.W. stated that Hamidullah gave her five or six Xanaxes per day, and J.R. recalled Hamidullah forced her to drink alcohol while handcuffed; and (5) L.P. stated that Hamidullah told her to recruit "young beautiful women" with "family issues" "so that he could create a sense of family" which he could exploit through "manipulat[ion]" and "mind games"; and A.W.

19

stated that she was recruited as an eighteen-year-old after recently losing custody of her child.

Contrary to Hamidullah's claim, these hearsay statements were sufficiently reliable to be considered at sentencing. For starters, the hearsay statements, in the main, provided specific details about the victims' traumatic experiences. *See United States v. Baptiste*, 935 F.3d 1304, 1317 (11th Cir. 2019) (finding a hearsay statement reliable in part due to its specificity). In addition, the victims' experiences were consistent with one another in describing Hamidullah's emotional, physical, and sexual abuse, and most disputed facts were supported by the statements of multiple victims. *See Gordon*, 231 F.3d at 761 (finding that consistency between the hearsay statements of codefendants "lend[ed] the statements credibility"). The hearsay statements were also consistent with and partially corroborated by the facts Hamidullah admitted as part of his guilty plea, including that he recruited women "by falsely offering employment," that he maintained a sexual relationship with one victim (L.P.), and that he used "a combination of force, fraud, and coercion," including physical assault and isolation, against another victim (A.W.). Finally, Hamidullah suggests that the victims were not reliable because they were "themselves coconspirators," but he does not explain why this would make their statements unreliable in the context of this case, and the victims all appear to have freely admitted to engaging in prostitution for Hamidullah during their interviews

with law enforcement. *See Baptiste*, 935 F.3d at 1317 (noting that statements against interest are more likely to be reliable).

All these factors lend credibility to the hearsay statements and are enough to establish that the statements had sufficient "indicia of reliability" to be considered without the need for explicit reliability findings. *See id.* ("[W]here the record and the circumstances of the case demonstrate adequate indicia of reliability, findings are not strictly necessary." (quotation marks omitted)).[2]   Accordingly, the district court did not procedurally err by relying on these statements to resolve Hamidullah's objections to the PSR or to impose an upward variance.

## B.

Turning to the substantive reasonableness of the sentence, we conclude that Hamidullah has not shown that the district court abused its discretion by sentencing him to a total term of 482 months in prison. *See United States v. Hayes*, 762 F.3d 1300, 1307 (11th Cir. 2014) ("We review the substantive reasonableness of a sentence for abuse of discretion.").

The district court must impose a sentence "sufficient, but not greater than necessary, to comply with the factors and purposes" in § 3553(a), which include "the

---

[2] Relying on our decision in *United States v. Lee*, 68 F.3d 1267 (11th Cir. 1995), Hamidullah contends that specific reliability findings are always required.  But as we explained in *Gordon* and reiterated in *Baptiste*, that is incorrect.  The need for reliability findings is evaluated on a case-by-case basis. *See Baptiste*, 935 F.3d at 1315–17; *Gordon*, 231 F.3d at 760–61.

need to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, deter criminal conduct, and protect the public." *United States v. Plate*, 839 F.3d 950, 957 (11th Cir. 2016). The court must also consider the nature and circumstances of the offense, the history and characteristics of the defendant, the applicable guideline range, and the need to avoid unwarranted sentencing disparities, among other factors. *Id.*

The advisory guideline range, though the "starting point and the initial benchmark" for sentencing, *Gall v. United States*, 552 U.S. 38, 49 (2007), "is but one of many considerations that a court must take into account in exercising its sentencing discretion," *United States v. Rosales-Bruno*, 789 F.3d 1249, 1254 (11th Cir. 2015). No particular weight is owed the guideline range. *See id.* We have "decided instead that, subject to review for reasonableness, sentencing courts may determine, on a case-by-case basis, the weight to give the Guidelines, so long as that determination is made with reference to the remaining section 3553(a) factors that the court must also consider in calculating the defendant's sentence." *United States v. Irey*, 612 F.3d 1160, 1217 (11th Cir. 2010) (*en banc*) (quotation marks omitted).

In imposing a sentence, the district court must consider all the § 3553(a) factors, but it may, in its discretion, weigh some factors more heavily than others. *Rosales-Bruno*, 789 F.3d at 1254. When the court decides after "serious consideration" that a variance from the guideline range is appropriate based on the

22

§ 3553(a) factors, it should explain that variance "with sufficient justifications." *Gall*, 552 U.S. at 46–47. The court's justification must be "compelling enough to support the degree of the variance and complete enough to allow meaningful appellate review," but an "extraordinary justification" is not required. *United States v. Shaw*, 560 F.3d 1230, 1238 (11th Cir. 2009) (quotation marks omitted). We must "give due deference to the district court's decision that the § 3553 factors, on a whole, justify the extent of the variance." *United States v. Turner*, 626 F.3d 566, 573 (11th Cir. 2010) (quotation marks omitted). And "we will not reweigh the factors" ourselves. *United States v. Johnson*, 803 F.3d 610, 620 (11th Cir. 2015).

Because we give district courts considerable discretion in making sentencing decisions, we will "sometimes affirm the district court even though we would have gone the other way had it been our call." *Rosales-Bruno*, 789 F.3d at 1254 (quotation marks omitted). "The party challenging a sentence has the burden of showing that the sentence is unreasonable in light of the entire record, the § 3553(a) factors, and the substantial deference afforded sentencing courts." *Id.* at 1256. Put differently, we will not vacate a sentence unless the party challenging it convinces us that it "lies outside the range of reasonable sentences dictated by the facts of the case." *Irey*, 612 F.3d at 1190 (quotation marks omitted).

Here, Hamidullah has not shown that the district court abused its discretion in weighing the § 3553(a) factors and imposing an above-guideline sentence of 482

23

months of imprisonment. The court considered the parties' arguments, the evidence presented at sentencing, and the factual basis in the plea agreement, and it expressly referenced several § 3553(a) factors, including the history and characteristics of the defendant, the guideline range, the seriousness of the offense, and the need to protect the public. After considering all these factors, the court implicitly concluded that the guideline range did not adequately reflect the seriousness of the offense conduct, the harm to Hamidullah's victims, and the danger Hamidullah posed to the community.

Hamidullah contends that the 482-month sentence is substantively unreasonable when viewed against the guideline range of 180 to 188 months and the government's recommended sentence of 188 months pursuant to a promise in the plea agreement. However, the advisory guideline range is simply "one of many considerations that a court must take into account in exercising its sentencing discretion," and no particular weight is owed to it. *Rosales-Bruno*, 789 F.3d at 1254. The same is true of the government's sentencing recommendation. Instead, the relevant question is whether "the sentence is unreasonable in light of the entire record, the § 3553(a) factors, and the substantial deference afforded sentencing courts." *Id.* at 1256.

And here, giving due deference to the district court, we cannot say that the extent of the variance was unreasonable under the totality of the circumstances and

the § 3553(a) factors.  The offense and relevant conduct were extremely serious.  As the court summarized, Hamidullah lured in young, troubled women with false promises of employment and forced them into prostituting for his benefit through a combination of violence, fraud, and coercion.  Hamidullah effectively imprisoned the victims and subjected them to brutal and depraved treatment—the "most depraved behavior" the court had seen outside of murder cases in five years on the federal bench.  Besides sexual slavery, that conduct included raping A.W. and using a metal dog leash to whip her, forcing T.R. to get an abortion, breaking L.P.'s nose and insisting that she have sex when she did not want to, and forcing the victims to be branded with a tattoo reflecting his claim of ownership over their bodies.  The harm this conduct caused the victims was incalculable, as reflected in the victim-impact statements.  Moreover, the depravity and brutality of Hamidullah's conduct supports the district court's conclusion that a sentence well in excess of the guideline range was necessary to protect the public from further crimes of Hamidullah.  Based on these disturbing facts, we cannot fault the district court for concluding that a 482-month, above-guideline sentence was necessary given the seriousness of the offense, the harm to the victims, and the need to protect the public, even if we might have imposed a lesser sentence "had it been our call." *Rosales-Bruno*, 789 F.3d at 1254.

Hamidullah's remaining arguments are unpersuasive.  He suggests his sentence is unreasonably harsh when compared to the sentence of time served

25

imposed on Davis, his codefendant. "A well-founded claim of disparity, however, assumes that apples are being compared to apples." *United States v. Docampo*, 573 F.3d 1091, 1101 (11th Cir. 2009) (quotation marks omitted). Davis's situation is simply not comparable because she had been convicted of a far less serious offense and was in part Hamidullah's victim. *See United States v. Jayyousi*, 657 F.3d 1085, 1118 (11th Cir. 2011) (explaining that courts "should not draw comparisons to cases involving defendants who were convicted of less serious offenses"). Hamidullah also contends that the district court failed to recognize that the needs for deterrence and protection of the public were lessened due to the restrictive conditions of his supervised release and his registration as a sex offender. The district court, however, considered and rejected Hamidullah's argument on this point, reasoning that these restrictions were not enough to reduce the length of incarceration because, in the court's experience, defendants routinely violate the terms of their supervised release. The weight to be given these factors was within the district court's discretion, and "we will not reweigh the factors" ourselves. *See Johnson*, 803 F.3d at 620.

## IV.

In sum, we affirm Hamidullah's convictions and total sentence for sex trafficking.

**AFFIRMED.**