[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

————————————————

No. 22-12971

————————————————

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

ROSHAWN JERMAINE DAVIS,
a.k.a. Roshwn Jemaine Davis,

Defendant-Appellant.

————————————————

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:20-cr-20265-BB-1

————————————————

Before WILLIAM PRYOR, Chief Judge, JORDAN, and MARCUS, Circuit Judges.

MARCUS, Circuit Judge:

On May 26, 2022, a jury, sitting in the Southern District of Florida, convicted Roshawn Jermaine Davis of one count of conspiracy to possess with intent to distribute controlled substances (heroin, fentanyl, and cocaine base), and nine counts of possession with intent to distribute controlled substances. Davis appeals his conspiracy conviction on various grounds, argues that cumulative error warrants reversal of his convictions, and challenges the district court's increase of his Sentencing Guidelines range. Davis also raises a *Faretta* issue concerning his right to self-representation at sentencing. After careful review, we affirm Davis's convictions, but we vacate his sentence and remand for the district court to conduct an appropriate *Faretta* inquiry.

I.

Beginning in August 2019, federal law enforcement officials used a confidential source to make a series of controlled drug purchases from a man named Roderick White. White sold the confidential informant ecstasy, cocaine, crack cocaine, heroin, and fentanyl. The investigation culminated in January 2020, when the FBI executed a search warrant at White's home and found a firearm, ammunition, marijuana, cocaine, crack cocaine, and pills. After FBI agents spoke with White, he agreed to cooperate and help law enforcement identify the source of the fentanyl he was selling. White identified the defendant, Roshawn Jermaine Davis, as his

supplier, and the FBI, through White, purchased crack cocaine, heroin, and fentanyl from Davis on nine different occasions between January and October 2020.

Over the course of the purchases, Davis and White engaged in numerous phone calls -- up to over a dozen in a single day -- in order to set up drug purchases of fentanyl, heroin, and cocaine. The FBI recorded these phone calls, and many were later played for the jury. Davis and White frequently communicated using coded terms. At no point did Davis express surprise or confusion about White's requests and orders. On one occasion, Davis asked White if he wanted "the usual," which FBI Special Agent Richard Lee testified meant that Davis and White had a "buyer/seller relationship where White is the buyer, the defendant is the seller, and they're very familiar with each other in this capacity."

In another call, Davis told White that he did not yet have the drugs White wanted to purchase because he was waiting for his supplier. During still another, White complained to Davis that the drugs he had purchased were short by some 14 grams. Davis said he did not think that the purchase was short but that he would call his supplier anyway.

On September 3, 2020, the FBI obtained a 30-day court-ordered wiretap to intercept calls and texts on Davis's cell phone. Much of the Government's case was based on these recorded phone calls. From the wiretap, the FBI learned the name of one of Davis's co-conspirators -- Jeff Hayden.

At some point during the 30-day wiretap period, Davis switched phones, so the FBI sought and obtained a 30-day court-ordered wiretap on Davis's new cell phone. The second wiretap also applied to Hayden. Davis and Hayden discussed drug trafficking too, including the details of how Hayden provided Davis with kilogram quantities of heroin or fentanyl sold in "block[s]."

In order to successfully monitor Davis's home, the FBI installed a pole camera, which offered a view of the back of Davis's house. During trial, the Government asked Special Agent Lee to explain why the FBI would "us[e] a pole camera like that to investigate someone like the Defendant." Lee responded: "The Defendant's a drug trafficker. So he -- " Davis immediately objected, and the court immediately sustained the objection and granted Davis's motion to strike the comment. The trial court also instructed the jury to disregard the statement. Special Agent Lee explained that a pole camera is an investigative technique often used to find the supplier of drugs.

The jury also listened to extensive drug trafficking discussions between the defendant Davis and Hayden, and with Ernest Grissom, Betsy Mieses, Darrington Horne, Tracy Battle, and Curtis Bridges. Lee explained that these individuals were "unindicted co-conspirators" and presented a series of photographs identifying each of them. The wiretaps, taken in concert with the footage from the pole camera, established an ongoing relationship between Davis and the unindicted co-conspirators.

Thus, for example, Grissom bought drugs from Davis and helped arrange a business relationship between Davis and Hayden. Grissom and Davis also spoke about drug trafficking and profits. What's more, pole camera footage revealed a hand-to-hand exchange between Davis and Grissom outside of Davis's home, shortly after an intercepted call showed Grissom calling Davis in order to buy cocaine. Soon after, Grissom called Davis, explaining that he had been stopped by law enforcement officials but that they had not found the cocaine in his pocket.

In still another recorded conversation, an unknown person informed Hayden that Grissom had overdosed on narcotics. Hayden identified Davis as the supplier of the drugs. Hayden instructed the other person to clean out Grissom's house and remove any dope before law enforcement officers returned.

The jury also learned that unindicted co-conspirator Mieses bought drugs from Davis and then sold them to her own customers. In the course of one of these calls, Mieses asked Davis about the consistency of a drug mixture and whether the drugs had been cut. Mieses also asked Davis if he was going to get drugs from another person.

Still other evidence established the relationship between Davis and the other co-conspirators. For example, the jury learned that Bridges bought drugs from and sold drugs to Davis. Meanwhile, Battle spoke with Davis about drug trafficking. Horne, in turn, supplied drugs to Davis, and Davis also told Horne to sell drugs for him. Davis also directed Mieses, one of his clients, to

Horne.  Other phone calls and pole camera footage revealed that a woman named Janie Howard called Davis and ordered "thirty" of an unspecified product.  Later the same day, she went to Davis's home, where the footage revealed Davis handing her something.

On several occasions during Special Agent Lee's testimony, the court sustained objections by Davis's counsel.  At one point, when testifying about co-conspirator Bridges, Lee said, "based on my observations, I believe he was a peer of the Defendant."  Counsel for Davis objected, and the court sustained the objection to the agent's opinion testimony.  Later on cross-examination, Lee described co-conspirator Horne as a "peer" of Davis; again, the court sustained Davis's objection.  And when testifying about co-conspirator Grissom, Special Agent Lee said that when Grissom called Davis to tell Davis he had been stopped by law enforcement officials, Davis asked "whether it was regular police or undercovers."  Lee opined that this was an important question because it established that the defendant was sophisticated.  Again, the court sustained Davis's objection.

Throughout Lee's testimony about "unindicted co-conspirators," the Government explained that none of the calls involved the cooperating witness, Roderick White.

On October 18, 2020, while monitoring the pole camera, FBI agents observed Davis bring a brick-shaped object from his car into his home.  The agents believed that it was a "kilo of fentanyl."  In order to confirm their suspicions, the next day, the FBI contacted confidential informant White and asked him to call Davis to see if

Davis could sell him fentanyl in a quantity that was significantly larger than usual. Davis confirmed that he could fulfill the order, and, indeed, he provided White with a sample of fentanyl.

Two days later, on October 21, 2020, the FBI executed a search warrant at Davis's home. Special Agent Joseph Lavelle told the jury that during the search of the defendant's home, the FBI recovered, among other things, the brick of suspected fentanyl, along with ammunition and scales. However, the brick did not test positive for narcotics; it turned out to be a brick of lactose.

A search of the defendant's cell phones revealed images of several baggies containing some substance; the largest baggie contained a "block" with an apple stamp consistent with the branding of narcotics for street level sales. File data revealed that the images were actually taken at Davis's home on October 5, 2020. Davis's cell phone also contained a video recording of a conversation between Davis and co-conspirator Battle discussing the quality of a drug product.

The FBI searched co-conspirator Mieses's home the same day. The agents found "many" clear plastic baggies, which Agent Levelle suggested were indicative of drug distribution activities. Mieses consented to a search of her cell phone, which revealed further communications with Davis about drug trafficking.

The jury also learned that after Davis was arrested, he made several phone calls and sent several emails from jail, asking various people -- including co-conspirator Mieses -- to tell others that White, in fact, was cooperating with the police. Notably, from jail,

Davis continued to discuss drug trafficking on the phone with Mieses.

During cross examination, Davis's counsel asked Lee why the unindicted co-conspirators were not arrested. Lee explained that the FBI "didn't want the case to end there. We wanted to work and cooperate with the Defendant. The Defendant chose not to, which is a hundred percent his choice, but -- " at which point defense counsel objected. Again, the court sustained the objection, struck the testimony, and instructed the jury to disregard the agent's comment.

At the end of the second day of trial, Davis moved for a mistrial based on Special Agent Lee's comments that Davis "is a drug trafficker" and that "I would love to sit down and proffer with the defendant." Davis did not seek a curative instruction, so the court did not give one. The court denied Davis's motion for a mistrial.

Davis put on no defense, and at the close of all of the evidence, he moved for judgment of acquittal. Davis argued that the Government had not proven a conspiracy; rather, it had simply presented numerous phone calls between various people setting up a series of distinct drug purchases. The court denied the motion.

During closing argument, the Government asserted that it had established a single conspiracy, at the center of which was the defendant Roshawn Jermaine Davis, who dealt with multiple unindicted co-conspirators, buying drugs from some of them, selling various kinds of drugs to others, and offering instructions

throughout.    The Government consistently and repeatedly referred to White as "the cooperating defendant."

Davis's closing argument controverted the Government's theory of the case -- suggesting that White planted drugs for his own benefit and trafficked in stolen goods, and that the defendant could not conspire with White, who was acting as an agent of the United States.

The court gave the Eleventh Circuit's pattern jury instructions for conspiracy without objection from either party.    The court did not instruct the jury that a government agent cannot be a conspirator.

About an hour and forty minutes into deliberations, the jury sent out a note saying, "It was mentioned Mr. White is not considered a conspirator, as he was working with the FBI.  Because the substances presented in evidence were provided by Mr. White, does this affect Count 1?"  Counsel for Davis proposed answering simply by saying, "Yes."  The Government, in turn, suggested the court refer the jury back to the instructions that had already been given.  Over Davis's objection, the district court told the jury this: "The Court has provided you with the instructions on the law to be followed, and all the evidence has been received.  You are to rely on the law and consider the evidence."

Twenty minutes later, the jury sent a second question: "If we do not come to an agreement on some of the counts, what happens?"  Without objection from either party, the court responded, "You are to continue your deliberations and try to come to a

unanimous verdict as to each count." About forty minutes later, the jury found Davis guilty on all counts.

On June 9, 2022, some two weeks after his conviction but before his sentencing, Davis filed a *pro se* motion to set aside the judgment and demand a new trial. The court struck the motion for violating Local Rule 11.1(d)(4) of the Southern District of Florida, since Davis was already represented by appointed counsel. Undeterred, on July 28, 2022, Davis filed still another *pro se* motion, this time to continue his sentencing hearing, saying that he had not timely received a copy of the Presentence Investigation Report ("PSI"), and that he needed more time to compile character letters for the court's consideration. Davis's counsel adopted Davis's motion. The court granted the motion and continued sentencing by about a month.

One week later, on August 5, 2022, Davis filed his third *pro se* motion, seeking to proceed *pro se*, relieve his trial counsel, set aside the jury verdict, and obtain a new trial. Davis's *pro se* Motion cited twice to *Faretta v. California*, 442 U.S. 806 (1975) in support of his right to proceed *pro se*. Again, the district court struck Davis's *pro se* omnibus motion for noncompliance with the court's Local Rules, since he was represented. Soon thereafter, Paul Donnelly -- Davis's counsel -- moved to withdraw as defense counsel, citing a "heavily deteriorating relationship" and "irreconcilable differences."

The court conducted an ex parte hearing on Donnelly's motion to withdraw. The trial judge asked Davis what specifically he

22-12971                 Opinion of the Court                      11

thought his attorney, Mr. Donnelly, could have done better or differently.  After Davis listed numerous grievances, the court had the following exchange with Davis:

> THE COURT: Is there anything else you want me to know before I decide whether to appoint a new attorney -- is that what you want the Court to do?  Do you want the Court to appoint you a new attorney to assist you with the sentencing hearing?
>
> THE DEFENDANT: Yes.
>
> THE COURT: Or did you want to represent yourself?
>
> THE DEFENDANT: Yes.  I would like to have a standby counsel.
>
> THE COURT: So what you're saying, sir, is somewhat in between the two.  That is, do you want me to appoint an attorney to represent you?
>
> THE DEFENDANT: I would like to proceed pro se and have a standby counsel.  Is that possible?
>
> THE COURT: Well, sir, I would need to colloquy you to determine whether, in fact, you can represent yourself.  And then I would make an independent decision whether the Court would appoint standby counsel.  So there's really not a middle ground for you.  The question for you is, number one -- you've told the Court that you want me to permit Mr. Donnelly to withdraw.  And that's the Court's responsibility, to determine whether that's appropriate.  And then,

secondly, you need to let me know if you want me to appoint another attorney to represent you or you want to represent yourself.

THE DEFENDANT: I would like to represent myself.

THE COURT: All right.  So, at this point, let me give Mr. Donnelly an opportunity to respond.  And then I'll inquire as to whether, in fact, it is appropriate to permit you to represent yourself.

After Donnelly explained his conduct and strategy, he told the court: "So Mr. Davis wants to go alone.  God bless him."  The court asked if he thought he could continue to effectively represent Davis at sentencing.  Donnelly said that he could, as long as Davis ceased "do[ing] things behind my back."  Mr. Donnelly added, "if [Davis] doesn't trust me, and he wants to do it his way, and he wants to go pro se, like I said, God bless him."

The court probed Donnelly about his trial experience and preparation for sentencing.  Counsel explained that he met with his client regarding the PSI, discussed possible objections to the PSI, and offered to file the objections with the defendant's consent.

The district court told Davis that the objections he had raised really amounted to unhappiness with the jury's verdict.  The court concluded that Donnelly had properly represented Davis and said that it believed Donnelly would continue to represent the defendant well and effectively.  The judge added that any deterioration in the attorney-client relationship was caused by Davis's attitude and there was no reason to believe Davis would get along

better with any other appointed attorney.  Ultimately, the court rejected Donnelly's claim that their differences were irreconcilable and denied counsel's motion to withdraw.  The court asked both Davis and Donnelly whether there was "anything further," and both replied, "No."

The PSI recommended that Davis's Guidelines calculation be based on two groups of drugs: first, the controlled substances Davis sold to White between January and October 2020, which totaled 28.62 grams of heroin, 179.64 grams of fentanyl, and 69.49 grams of crack cocaine; and second, the drugs White sold to another cooperating source between August 14, 2019 and January 16, 2020 -- totaling 29.5 grams of heroin, 153 grams of fentanyl, 77.44 grams of cocaine, and 187.51 grams of crack cocaine -- for which White said Davis was the sole supplier.  In all, the PSI recommended that the total amount -- 58.12 grams of heroin, 332.64 grams of fentanyl, 77.44 grams of cocaine, and 257 grams of crack cocaine -- be considered part of Davis's relevant conduct.

According to the Drug Equivalency Tables, which combine differing drugs and convert them to a single weight, these totals resulted in 1,822.95 kilograms of converted drug weight, yielding a base offense level of 30.  Davis also received two two-level enhancements for a total offense level of 34.  The PSI recommended finding a criminal history category of IV, with a total of nine criminal history points.

At the sentencing hearing, defense counsel continued to represent Davis.  The district court sustained Davis's objections to the two two-level enhancements.

The Government offered the testimony of Special Agent Justin M. Carsten, who said that he initially arrested White and worked with White throughout the entire operation, that White made it explicit that Davis was his only source of narcotics, and that the FBI independently corroborated the information White had offered.

The district court found that the Government had sustained its burden of proof by a preponderance of the evidence that Davis was White's source of supply for the August 19, 2019 to January 16, 2020 period, and it overruled Davis's objections to the drug amounts and his criminal history.  The court arrived at a total offense level of 30 and a criminal history category of IV, yielding a Guidelines range of 135 to 168 months' imprisonment.  Davis was sentenced to 135 months in prison followed by a period of supervised release of four years, and was found responsible for a special assessment in the amount of $1,000.

This timely appeal followed.

On January 17, 2025, after oral argument and while this appeal was pending, President Joseph R. Biden, Jr. commuted Davis's sentence, along with the sentences of several hundred other defendants convicted of drug offenses, setting July 16, 2025 as Davis's release date.  The President's commutation left unchanged Davis's

term of supervised release and the other components of his sentence.[1]

## II.

## A.

First, Davis argues that the district court plainly erred when it did not instruct the jury *sua sponte* that the defendant could not conspire with a government informant, even though he did not request that instruction or object to the jury instructions given. We review this issue only for plain error. *United States v. Deason*, 965 F.3d 1252, 1265 (11th Cir. 2020). We may find plain error only where "(1) there is an error; (2) that is plain or obvious; (3) affecting the defendant's substantial rights in that it was prejudicial and not harmless; and (4) that seriously affects the fairness, integrity or public reputation of the judicial proceedings." *United States v. Hall*, 314 F.3d 565, 566 (11th Cir. 2002). "The Supreme Court has instructed us that plain error review should be exercised sparingly, and only in those circumstances in which a miscarriage of justice would otherwise result." *United States v. Rodriguez*, 398 F.3d 1291, 1298 (11th Cir. 2005) (internal quotation marks and citations omitted). Davis carries the "difficult" burden of establishing each of the four prongs. *Greer v. United States*, 141 S. Ct. 2090, 2097 (2021) (quoting

---

[1] President Biden's commutation remits "up to $10,000 of the unpaid balance of the fine or restitution amount imposed by the court that remains at the end of [Davis's] sentence." However, since the district court imposed no fine or restitution at sentencing, this provision does not apply to Davis.

*Puckett v. United States*, 556 U.S. 129, 135 (2009)).  He has not done so.

This matter is easily resolved at the first two steps of the analysis because there was no error at all, much less one that was "plain or obvious."  *Hall*, 314 F.3d at 566.  A trial court has "broad discretion in formulating a jury charge so long as the charge as a whole accurately reflects the law and the facts."  *United States v. Richardson*, 233 F.3d 1285, 1292 (11th Cir. 2000) (quoting *United States v. Turner*, 871 F.2d 1574, 1578 (11th Cir. 1989)).

There is no dispute that the district court gave accurate jury instructions on the law of conspiracy.  Davis argues, nevertheless, that the district court had a duty to affirmatively inform the jury that he could not be convicted of conspiring with a government agent.  Davis's argument is wrong and relies on two readily distinguishable cases: *Sears v. United States*, 343 F.2d 139 (5th Cir. 1965)[2] and *United States v. Lively*, 803 F.2d 1124 (11th Cir. 1986).

In *Sears*, the defendant was indicted and convicted for conspiracy, but he had only ever worked with a government agent.  *See Sears*, 343 F.2d at 140–41.  The former Fifth Circuit held that although a defendant could still be convicted of conspiracy, the district court erred by not giving a requested instruction that the jury could convict only if the defendant acted with knowledge that

---

[2] In *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (en banc), we adopted as binding precedent all Fifth Circuit decisions issued before October 1, 1981.  *Id.* at 1209.

other people were also involved in the conspiracy. *Id.* at 141–42. In *Lively*, the indictment alleged that the defendant conspired with Richards during a period that included dates after Richards became a government informant. *Lively*, 803 F.2d at 1126. The jury was not instructed that the defendant could not conspire with Richards after Richards started working with the government, so we held that the district court erred in denying a requested *Sears* instruction. *Id.* at 1126, 1128.

*Sears* and *Lively* are plainly distinguishable because both cases included little or no evidence involving conspiracies with numerous people who were not agents of the Government. In sharp contrast, in this case, the evidence amply supported the conspiracy count and the involvement of multiple conspirators, albeit uncharged. Far from being a "brief, weak, and disjointed" presentation of evidence, as Davis characterizes it, the Government's proofs were extensive. Nearly a full day of the four-day trial involved reviewing many communications between Davis and his co-conspirators, including numerous instances of phone calls or videos of Davis making drug deals with many people other than White. Davis repeatedly discussed drug trafficking with others, the profits he made, and product quality.

The defendant also coordinated numerous drug purchases with other co-conspirators on his behalf, and indeed referred clients to his co-conspirators. Moreover, the Government took great care to distinguish between the cooperating informant, White, and the many "unindicted co-conspirators." Indeed, the Government

named each co-conspirator separately and explained the role each played.

By the time the court instructed the jury, the risk that the jury might convict the defendant of conspiracy based simply on his interaction with the Government's agent was negligible. The risks in *Sears* and in *Lively* were wholly different. The district judge's failure to give an instruction *sua sponte* was not error, especially given the court's "broad discretion" to deliver its instructions and in the absence of any request from the defendant. *Richardson*, 233 F.3d at 1292 (quoting *Turner*, 871 F.2d at 1578).

Furthermore, even if Davis had established error that was plain, he has not shown how any error affected his substantial rights. *Rodriguez*, 398 F.3d at 1298. To affect substantial rights, the error generally must have a reasonable probability of undermining confidence in the outcome. *Id.* at 1299. The defendant's burden is "anything but easy." *Id.* Counsel for both the Government and Davis explicitly informed the jury that they could not convict Davis based on a conspiracy with White, and the jury indicated that they understood this fact, based on the note they sent.

What's more, the Government repeatedly told the jury that the charged conspiracy involved "Mieses, Hayden, Grissom, Battle, Horne, [and] Bridges," and that the conspiracy was a plan the defendant had with his suppliers to sell heroin. In the face of "overwhelming" evidence and the clarity with which the Government framed the conspiracy and the participation of numerous unindicted co-conspirators (as opposed to White), the trial court's

failure to give a *Sears* instruction cannot reasonably have affected the outcome of the case or our confidence in the verdict.

For similar reasons, the district court did not err in declining to respond to the jury's note with a statement that the defendant cannot conspire with a government agent, as Davis argues. "We review a district court's response to a jury question" -- including refusal to give a requested jury instruction -- "for an abuse of discretion," and generally will reverse only "when we are left with a substantial and ineradicable doubt as to whether the jury was properly guided in its deliberations." *United States v. Lopez*, 590 F.3d 1238, 1247–48 (11th Cir. 2009) (quoting *United States v. Grigsby*, 111 F.3d 806, 814 (11th Cir. 1997)). "[A] district court has considerable discretion regarding the extent and character of supplemental jury instructions," so long as it does not "misstate the law or confuse the jury." *Id.* We consider a challenged supplemental jury instruction as being "part of the entire jury charge, in light of the indictment, evidence presented and argument of counsel to determine whether the jury was misled and whether the jury understood the issues." *Id.* at 1248 (quoting *United States v. Johnson*, 139 F.3d 1359, 1366 (11th Cir. 1998)).

Here, the court's response to the jury's question properly referred the jury back to the original jury instructions. We've held that a "reference back to the originally delivered instructions could be construed as not a supplemental instruction at all." *United States v. Parr*, 716 F.2d 796, 809 (11th Cir. 1983). Again, the original jury instructions were accurate and sufficient. In situations like these,

where the jury's question is "unclear," the trial court did not abuse its discretion in referring the jury back to its original unobjected-to instructions. *See id.*

What's more, when considering the jury charge, the evidence presented, and the argument of counsel, there is no doubt -- much less "substantial and ineradicable doubt," *see Lopez*, 590 F.3d at 1248 (quoting *Grigsby*, 111 F.3d at 814) -- that the jury was not misled in its deliberations. *See Grigsby*, 111 F.3d at 814. Both the Government and defense counsel made it crystal clear that White could not be considered to be part of the conspiracy. In fact, any doubt about whether the jury was misled was dispelled by the jury's question itself, which did not ask whether it was true that Mr. White was not a conspirator, but rather asked about the extent to which that fact affected the evidence in the case. On this record, there can be no question that the jury understood that White was not a conspirator, and there was no abuse of the trial court's discretion.

## B.

Davis further claims that cumulative errors at trial warrant reversal. At the outset, we consider each of Davis's asserted errors one by one before we can determine whether there was "cumulative" error. *United States v. Calderon*, 127 F.3d 1314, 1333 (11th Cir. 1997). Davis has the burden of demonstrating that the aggregation of claimed errors affected his substantial rights and rendered the trial unfair. *United States v. Capers*, 708 F.3d 1286, 1299 (11th Cir. 2013).

Davis first says that the agent's "[r]epeated improper and prejudicial comments on the defendant's right to silence" constituted error.  Davis points to two statements, both of which arose on cross-examination of Special Agent Lee: the first, when explaining why no co-conspirators were arrested, was Lee's statement that the FBI "didn't want the case to end there.  We wanted to work and cooperate with the Defendant.  The Defendant chose not to, which is a hundred percent his choice, but -- "; and the second was Lee's response when he was asked about the brick of lactose, "I would love to sit down and proffer with the Defendant."

Davis is correct that these statements were error.  "It is well settled that prosecutorial comment on an accused's silence for substantive or impeachment value is constitutionally, or otherwise, prohibited." *United States v. Gonzalez*, 921 F.2d 1530, 1549 (11th Cir. 1991); *Doyle v. Ohio*, 426 U.S. 610, 611, 619 (1976).  But these statements do not rise to a level requiring that a mistrial be declared.  As Davis has acknowledged, the longstanding rule in this Circuit has been that a "single comment" about a defendant's post-arrest silence "does not automatically suffice to violate [the] defendant's rights when the government does not specifically and expressly attempt to *use* . . . the improper comment to impeach the defendant." *United States v. Stubbs*, 944 F.2d 828, 835 (11th Cir. 1991).

Although Davis says that Special Agent Lee made two comments, not one, at the heart of the constitutional violation he has alleged is not the number of comments but rather "the use of an accused's silence against him at trial by way of *specific inquiry or*

22                     Opinion of the Court                   22-12971

*impeachment . . . ." Id.* (quoting *Lindgren v. Lane*, 925 F.2d 198, 201 (7th Cir. 1991)).  Where "[t]he prosecution made no 'specific inquiry or argument' about [the] defendant's postarrest silence," the Court generally must "conclude there was no *Doyle* violation." *Id.* Lee made two impermissible comments, but the Government did not inquire into either specifically, nor did the Government use either in any way in argument.  Lee made both comments during cross examination to explain other matters.

What's more, Davis has not shown, as he argues, that any prejudice from these comments "was incurable."  "This Circuit has held that the harmless error doctrine is applicable to unconstitutional comment on silence." *Gonzalez*, 921 F.2d at 1549.  In *Gonzalez*, we held as harmless a comment on the defendant's silence when the testimony accounted for "only a few moments during an eight-day trial," and when "[t]he prosecutor did not focus on, nor emphasize Special Agent Eledge's response, or Gonzalez's silence," nor did the prosecution intentionally elicit the testimony or raise it again in argument. *Id.* at 1549–50.  Like in *Gonzalez*, here the testimony at issue accounted for only a few moments during a four-day trial, the Government did not intentionally elicit the testimony, nor did the Government emphasize, focus on, or return to Special Agent Lee's testimony in any way.  We have emphasized the harmless nature of isolated comments on the defendant's silence when the evidence -- as it is here -- was "otherwise overwhelming" so as to have "no 'substantial and injurious effect or influence in determining the jury's verdict.'" *United States v. Miller*, 255 F.3d 1282,

1285–86 (11th Cir. 2001) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993)).

Davis also argues that a group of errors involving "opinion testimony" offered by Lee constitutes reversible error. Davis first points to Special Agent Lee's statement -- explaining why a pole camera was used to "investigate someone like the Defendant" -- that "[t]he Defendant's a drug trafficker." Davis's counsel objected immediately, and the comment was promptly stricken from the record. What's more, the court instructed the jury to disregard it. Though the statement was made in error, since it was an opinion on the ultimate issue, it was promptly cured, and we have held that "[a] curative instruction purges the taint of a prejudicial remark because 'a jury is presumed to follow jury instructions.'" *United States v. Simon*, 964 F.2d 1082, 1087 (11th Cir. 1992) (quoting *Adams v. Wainwright*, 709 F.2d 1443, 1447 (11th Cir. 1983)) (collecting cases).

Davis also points to Special Agent Lee's statements that: (1) Davis was "sophisticated" when he asked whether police were working undercover, which was objected to and sustained; (2) Bridges and Horne were "peers" of Davis, which was also objected to and sustained; and (3) six other individuals were "co-conspirators" in the case. But all of these statements -- most of which were objected to and sustained anyway -- were not actually in error at all, because under Federal Rule of Evidence 701, a law enforcement officer may give lay-opinion testimony based on his experience as a police officer, including testifying about the meaning of

conversations by or with defendants. *See, e.g.*, *United States v. Novaton*, 271 F.3d 968, 1008–09 (11th Cir. 2001) (collecting cases).

Davis next claims that the prosecutors impermissibly inserted their own opinions, including during the Government's opening statement when the prosecutor said, "I know that you're going to find him guilty," and during the Government's closing argument when another prosecutor said that the defendant's theory about White hiding drugs and providing them to police was "impossible" based on the testimony of the officers who searched White.

Davis objected to neither statement, so again we review only for plain error. But there was no error here, much less plain error. A prosecutor cannot exhort or pressure the jury by expressing his own personal opinion about the defendant's guilt, but he may suggest the defendant's guilt based upon and grounded in the evidence that has been presented to the jury. *United States v. Bernal-Benitez*, 594 F.3d 1303, 1315 (11th Cir. 2010).

The Government did no more than that. In each instance, the prosecutor was not urging the jury to convict based on his own personal belief, but rather based on the evidence.

Finally, Davis complains that the Government misled the jury by implying that White was a co-conspirator. But the Government was crystal clear during rebuttal argument that other co-conspirators, not White, acted as Davis's co-conspirators:

> And Defense counsel's right. [Davis] can't conspire
> with Mr. White. Mr. White was acting as an agent of

the Government.  He is correct about that one point. But it is clear from the conversations, from common sense, from knowledge of how the world works and how relationships work between people, that Mr. Davis was getting his supply of drugs that he sold to White from other people.  That is a conspiracy.

No errors in trial came close to warranting a mistrial; they were harmless, cured, or not errors at all.  Taken together, they cannot be said to have rendered Davis's trial unfair or to require that his convictions be overturned.  *See United States v. Baker*, 432 F.3d 1189, 1223 (11th Cir. 2005); *Calderon*, 127 F.3d at 1333.

III.

A.

As for the sentencing matters raised by Davis, the most serious one is his claim that the district court erred by failing to conduct a hearing pursuant to *Faretta v. California*, after Davis repeatedly expressed a clear and unequivocal desire to proceed *pro se* at sentencing.

At the outset, we note that even with President Biden's recent commutation of Davis's sentence, this issue is not moot.  We consider mootness *sua sponte* because it is a basic jurisdictional issue.  *Nat'l Advert. Co. v. City of Miami*, 402 F.3d 1329, 1331–32 (11th Cir. 2005) (per curiam).  "A case on appeal becomes moot, and ceases to be a case or controversy, 'when it no longer presents a live controversy with respect to which the court can give meaningful relief.'"  *United States v. Al-Arian*, 514 F.3d 1184, 1189 (11th Cir.

2008) (per curiam) (quoting *Al Najjar v. Ashcroft*, 273 F.3d 1330, 1336 (11th Cir. 2001) (per curiam)).

Davis has not withdrawn his *Faretta* argument on appeal since President Biden commuted his sentence on January 17, 2025. What's more, the requested relief -- resentencing -- could result in a lower sentence to Davis than his current sentence as modified by the President's commutation, which is set to end on July 16, 2025. The sentencing issues are not moot.

As a preliminary matter, the Government argues that the *Faretta* issue was not raised in Davis's initial brief and, therefore, it was forfeited. Generally, "a party may not raise through a supplemental brief an issue not previously raised in his principal brief." *United States v. Hembree*, 381 F.3d 1109, 1110 (11th Cir. 2004) (collecting cases). However, "the refusal to consider arguments not raised is a sound prudential practice, rather than a statutory or constitutional mandate, and there are times when prudence dictates the contrary." *United States v. Campbell*, 26 F.4th 860, 872 (11th Cir. 2022) (en banc) (quoting *Davis v. United States*, 512 U.S. 452, 464 (1994) (Scalia, J., concurring)). We have on occasion exercised our discretion to consider a forfeited issue when "the proper resolution is beyond any doubt." *Id*. at 873. Davis expressed a clear and unequivocal desire to proceed *pro se* and he was therefore entitled to a *Faretta* hearing.

Moreover, the underlying reason we deem as abandoned issues not raised in the initial brief is because the "appellee is entitled to rely on the content of an appellant's brief for the scope of the

issues appealed." *Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1330 (11th Cir. 2004) (quoting *Pignons S.A. De Mecanique v. Polaroid Corp.*, 701 F.2d 1, 3 (1st Cir. 1983)). Put differently, if the argument is not in the initial brief, "the appellee would have no opportunity to respond to it." *Id.* This concern is not present here, since the Court granted Davis's motion to file his supplemental brief over the Government's opposition and gave the Government thirty days to respond.

We turn therefore to the merits of Davis's argument. A defendant's waiver of his right to counsel is a mixed question of fact and law that we review *de novo*. *United States v. Evans*, 478 F.3d 1332, 1340 (11th Cir. 2007). Notably, the Supreme Court has ruled that a violation of a defendant's right to self-representation is not subject to harmless error review, but instead requires automatic reversal. *See McKaskle v. Wiggins*, 465 U.S. 168, 177 n.8 (1984).

In *Faretta v. California*, the Supreme Court held that "[t]he Sixth Amendment does not provide merely that a defense shall be made for the accused; it grants to the accused personally the right to make his defense." *Faretta*, 422 U.S. at 819. Under *Faretta*, when a defendant "clearly and unequivocally declare[s] to the trial judge that he want[s] to represent himself and [does] not want counsel," the trial judge has a constitutional duty to ensure that the defendant "competently and intelligently" chooses self-representation and, if he does, to permit him to do so. *See id.* at 835–36.

We've previously said that the Sixth Amendment right to counsel applies to all "critical stage[s]" of a criminal proceeding,

including sentencing.  *See, e.g.*, *Golden v. Newsome*, 755 F.2d 1478, 1483 (11th Cir. 1985).  And the Supreme Court in *Faretta* was clear that "the Sixth Amendment right to the assistance of counsel implicitly embodies a correlative right to dispense with a lawyer's help."  *Faretta*, 422 U.S. at 814 (internal quotation marks and citation omitted).  Thus, although not explicitly determined by *Faretta* or by any published case from this Court, as we see it, if there is a right to counsel at sentencing -- which is undeniable -- then it follows that there is also a correlative right to proceed *pro se* at sentencing if a defendant has clearly and unequivocally sought to do so, and if the court has made the appropriate determination after a searching *Faretta* inquiry.  Consistent with this theory, at least six other Circuits have explicitly found that *Faretta* can be invoked after trial but before sentencing.  *See, e.g.*, *United States v. Johnson*, 367 F. App'x 375, 377 (3d Cir. 2010) (unpublished); *United States v. Cano*, 519 F.3d 512, 515 (5th Cir. 2008); *United States v. Jones*, 489 F.3d 243, 248 (6th Cir. 2007); *United States v. Mancillas*, 880 F.3d 297, 301 (7th Cir. 2018); *Lopez v. Thompson*, 202 F.3d 1110, 1117 (9th Cir. 2000); *United States v. Silkwood*, 893 F.2d 245, 249 (10th Cir. 1989).  We join them today.

Davis's request to proceed *pro se* was clear and unequivocal. Davis filed a written *pro se* motion asking to proceed *pro se*.  His motion was titled, "Defendant's Motion to Proceed Pro Se, to Relieve Counsel, to Set Aside Jury Verdict & Order a New Trial, Pursuant to Rule 33(b)(2) of the Federal Rules of Criminal Procedure." In the motion, Davis repeatedly cited to *Faretta* itself as well as to *United States v. Cesal*, 391 F.3d 1172 (11th Cir. 2004), *vacated*, 545

U.S. 1101 (2005), to support his claimed right to go it alone at sentencing. Indeed, Davis's counsel subsequently moved to withdraw, observing in his own motion that Davis had expressed the desire to proceed *pro se*. At that point, the district court conducted a hearing, where Davis renewed his request to proceed *pro se*.

At the start of the hearing, the court acknowledged that Davis had moved to proceed at sentencing *pro se*. The court asked Davis if he wanted a new attorney or if he wanted to represent himself, and Davis said he wanted to represent himself with standby counsel. The trial judge then offered Davis a binary choice: he could either have new counsel, or he could represent himself. Davis, in no uncertain terms, replied, "I would like to represent myself." This was a clear and unequivocal waiver of counsel and a request to proceed *pro se*, and the district court acknowledged as much, replying, "All right. So, at this point, let me give Mr. Donnelly an opportunity to respond. And then I'll inquire as to whether, in fact, it is appropriate to permit you to represent yourself."

The problem is that the court never followed through on what it said it would do and what the law required it to do. Instead, the district court determined that Mr. Donnelly was competent and there had not been an irreconcilable breach in the attorney-client relationship. The court denied counsel's motion to withdraw. It never conducted the *Faretta* hearing, and Davis proceeded to sentencing with counsel.

The Government's argument that Davis's request was unclear, properly understood "as frustration with the trial verdict and not a genuine request for self-representation," or "at most a request to proceed with standby counsel" is foreclosed by the record and by our precedent. In *Dorman v. Wainwright*, 798 F.2d 1358 (11th Cir. 1986), we held that in order to invoke the right to proceed *pro se* under *Faretta*, a defendant "must do no more than state his request, either orally or in writing, unambiguously to the court so that no reasonable person can say that the request was not made." *Id.* at 1366. "[A] defendant does not need to recite some talismanic formula hoping to open the eyes and ears of the court to his request." *Id.*

In *Dorman*, although the defendant "never had a formal opportunity to show that he had the requisite knowledge and intelligence to waive his right to counsel," he cited *Faretta* in written requests to the trial judge and "began civil proceedings against the Public Defender[,] hoping to create a conflict of interest." *Id.* at 1366–67. Rejecting the Government's argument that "Dorman's wish . . . was not to proceed pro se, but to avoid having his case handled by the Public Defender," we concluded that "[n]o reasonable person could deny that Dorman wanted to conduct his own defense." *Id.*

Davis has gone even further. Not only did he file a written request to the court expressly citing *Faretta*, just as Dorman did, Davis formally told the court at the hearing that he wanted to represent himself. "No reasonable person could deny that" Davis

wanted to proceed *pro se*. *See id.*; *see also Stano v. Dugger*, 921 F.2d 1125, 1144 (11th Cir. 1991) (collecting cases); *Orazio v. Dugger*, 876 F.2d 1508, 1512 (11th Cir. 1989) (holding that the defendant "clearly and unequivocally asserted his desire to represent himself" by telling the trial judge at a hearing that he wanted to represent himself); *United States v. Edwards*, 716 F.2d 822, 824 (11th Cir. 1983) (per curiam) (finding that the defendant "made a knowing and intelligent decision to relinquish his right to counsel" in light of his filed motion requesting that his attorney withdraw and his responses to multiple inquiries by trial court).

The Government argues in the alternative that Davis's request for self-representation was waived by his own conduct, since Davis "raised no objection when Donnelly represented him at sentencing, even when the court referred to Donnelly as Davis's attorney." But again, this argument is foreclosed by *Dorman*. In *Dorman*, after failing to hold a *Faretta* hearing, the trial judge permitted the withdrawal of the public defender and appointed a new attorney, Timmerman. *Dorman*, 798 F.2d at 1367. Although "Dorman stopped filing letters and requests to proceed pro se" from when Timmerman was appointed until after trial, we noted that Dorman would have run the risk of contempt of court had he continued to file letters and motions, "and it would be a weak right indeed if a defendant had to risk sanctions by the court to keep a constitutional right." *Id.* Ultimately, we held that "[a]fter a clear denial of the request, a defendant need not make fruitless motions or forego co-operation with defense counsel in order to preserve the issue on

appeal." *Id.* (quoting *Brown v. Wainwright*, 665 F.2d 607, 612 (5th Cir. 1982)).

Following the district court's denial of his counsel's motion to withdraw, Davis was not required to make repetitive motions or to forego cooperation with his counsel in order to preserve the issue. The cases cited by the Government to the contrary are inapposite, since Davis never sought permission from the court to act as co-counsel, *see Cross v. United States*, 893 F.2d 1287, 1291 (11th Cir. 1990), nor did he clarify that his application to proceed *pro se* was only for the purpose of arguing specific motions, *see United States v. Dormeus*, 523 F. App'x 545, 547–48 (11th Cir. 2013) (unpublished). Rather, Davis unequivocally asserted his Sixth Amendment right and then remained silent after the district court denied the request and affirmed Donnelly's representation of Davis. Davis's silence was not a waiver, and he needed to do no more to preserve the issue.

The Supreme Court has said that because "the right of self-representation is a right that when exercised usually increases the likelihood of a trial outcome unfavorable to the defendant, its denial is not amenable to 'harmless error' analysis." *McKaskle*, 465 U.S. at 177 n.8. "The right is either respected or denied; its deprivation cannot be harmless." *Id.* When a defendant is deprived of his Sixth Amendment right to self-representation, the ensuing proceedings must be vacated. *See, e.g.*, *Faretta*, 422 U.S. at 836 (finding that the defendant was denied the right to conduct his own defense

at trial and thus vacating the conviction and remanding for a new trial).

Since Davis invoked his right to self-representation before the sentencing proceeding but was denied that right, we are required to vacate his sentence and remand for resentencing, at which time the court is obliged to conduct a searching *Faretta* inquiry before determining whether Davis could represent himself. *See, e.g.*, *Cano*, 519 F.3d at 517 ("Accordingly, we AFFIRM the conviction, VACATE the sentence, and REMAND for re-sentencing after a *Faretta* hearing."); *Mancillas*, 880 F.3d at 302 ("Since denial of the right to self-representation is not subject to the harmless error analysis, we must remand for resentencing. On remand, the court should inquire as to whether Mancillas wishes to represent himself at resentencing." (internal citation omitted)); *Silkwood*, 893 F.2d at 249 ("[W]e remand this case for resentencing and direct the sentencing court to appoint counsel to assist Mr. Silkwood unless, after proper inquiry, Mr. Silkwood waives that right.")

## B.

Davis also challenges the district court's failure at sentencing to make a finding about the credibility of certain hearsay statements offered by Agent Carsten. Specifically, Davis objects to Carsten's testimony about what White told him concerning the defendant's role as White's drug supplier. Because this challenge is likely to recur during resentencing, we address it now. We review the district court's factual findings at sentencing only for clear error

and any questions of law *de novo*. *United States v. McGuinness*, 451 F.3d 1302, 1304 (11th Cir. 2006) (per curiam).

Davis's reasoning goes this way. Because the district court never made a credibility finding regarding the hearsay statements, the district court could not have included the drugs White sold to the other cooperating witness as relevant conduct for Davis's sentencing. Accordingly, Davis argues that: (1) the weight of the drugs White sold could not have been included in Davis's offense level calculation; and (2) the relevant conduct of the offense could not have begun until January 2020, as opposed to August 19, 2019, thereby yielding the conclusion that Davis's 2000 conviction could not be included in calculating his criminal history category, since it would fall outside of the 15-year window for prior convictions.

As we see it, the dispositive question is whether the district court was required to make a formal finding as to the credibility of the hearsay statements. This much is clear: when resolving a dispute concerning a factor relevant to sentencing, the sentencing court may rely on any "relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy." U.S.S.G. § 6A1.3. Moreover, the sentencing court generally does not need to make "distinct findings regarding the reliability of hearsay statements used at sentencing" if "the reliability of the statements is apparent from the record." *United States v. Gordon*, 231 F.3d 750, 761 (11th Cir. 2000).

Davis argues that a formal finding of credibility was necessary because the reliability of the hearsay statements was not apparent from the record. Davis rests primarily on *United States v. Lee*, 68 F.3d 1267 (11th Cir. 1995). In *Lee*, we held that a hearsay statement that drugs were attributable to the defendant did not have "sufficient indicia of reliability," especially because the source of the otherwise uncorroborated hearsay statement was a fugitive from justice. *Id.* at 1275–76 (quoting *United States v. Castellanos*, 904 F.2d 1490, 1495 (11th Cir. 1990)). We also explained that a declaration made against the speaker's penal interest can bolster its credibility. *Id.*

We clarified the holding and reach of *Lee* in *United States v. Gordon*. There, we emphasized that *Lee*'s holding was a product of its circumstances, in that the co-conspirator's status as a fugitive undermined the usual reliability of a statement against one's penal interest. *Gordon*, 231 F.3d at 760–61. By contrast, in *Gordon*, the reliability of the hearsay statement was bolstered by materially consistent evidence from three co-defendants establishing the defendant's role in the offense, so no specific finding of reliability was necessary. *Id.* at 761. In *United States v. Baptiste*, 935 F.3d 1304 (11th Cir. 2019), we again found that the traditional indicia of reliability were present because the hearsay statement at issue was "clearly against both [the declarant's] and Baptiste's penal interests," and there was "no 'fugitive from justice'-like reason here, as there was in *Lee*, to discount the force of that established gauge of reliability." *Id.* at 1316–17.

The facts of this case are far closer to those found in *Gordon* and *Baptiste* than to those found in *Lee*. White's statements were against his penal interest. Agent Carsten also testified that the FBI independently corroborated the information White had given them and that White's phone records indicated that Davis was either the sole source of White's supply or the primary source of the drugs. The relevant facts, taken as a whole, constitute sufficient indicia of reliability. The district court did not need to make a specific credibility finding.

In sum, we **AFFIRM** Davis's conviction, **VACATE** Davis's sentence, and **REMAND** for resentencing consistent with President Biden's commutation of his prison term. Again, on remand, the court shall conduct an appropriate *Faretta* inquiry if Davis seeks to represent himself at resentencing.

**AFFIRMED IN PART, VACATED IN PART, AND REMANDED.**